704 F.2d 467
 1983-1 Trade Cases 65,334, 9 Media L. Rep. 1489
 COMMITTEE FOR AN INDEPENDENT P-I, People Opposed to a
One-Newspaper Town, Committee for a Free Press,
Longview Publishing Co., et al.,
Plaintiffs-Appellees-Cross-Appellants,
v.
The HEARST CORP. and The Seattle Times Co.,
Defendants-Appellants-Cross-Appellees,
and
William French Smith, Attorney General for the United
States, Defendant-Appellant-Cross-Appellee.
 Nos. 82-3488, 82-3493 and 82-3523.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 17, 1982.
Decided April 21, 1983.
 
 William L. Dwyer, Culp, Dwyer, Guterson & Grader, Seattle, Wash., for Committee For An Independent P-I.
 Jonathan E. Thackeray, Baker & Hostetler, Cleveland, Ohio, for Hearst Corp.
 Douglas Letter, Dept. of Justice, Washington, D.C., for Smith & U.S.
 Appeal from the United States District Court for the Western District of Washington.
 Before ANDERSON, HUG, and POOLE, Circuit Judges.
 J. BLAINE ANDERSON, Circuit Judge:
 
 
 1
 This action presents issues of first impression concerning the scope and operation of the Newspaper Preservation Act. This Act permits competing newspapers that meet certain qualifications to enter into joint arrangements which otherwise would be violative of the antitrust laws. In a memorandum opinion, the district court overturned the Attorney General's action approving a joint operating agreement proposed between the Seattle Post-Intelligencer and the Seattle Times. We reverse and reinstate the Attorney General's decision.
 
 I. BACKGROUND
 
 2
 On March 27, 1981, the Seattle Times Company, owner of the Seattle Times (the "Times"), and The Hearst Corporation, owner of the Seattle Post-Intelligencer (the "P-I"), applied to the United States Attorney General for approval of a joint operating agreement ("JOA") pursuant to the Newspaper Preservation Act (the "Act"), 15 U.S.C. Secs. 1801-1804.[1] The Times, founded in 1896, and the P-I, founded in 1891, have been the only metropolitan daily newspapers in Seattle for some time. For approximately the last 15 years, the P-I has been losing ground to the Times in terms of circulation and advertising revenue. From 1969 through 1980, the P-I lost over $14 million.
 
 
 3
 The Newspaper Preservation Act gives the United States Attorney General the authority to approve joint operating agreements between competing newspapers. This approval provides the agreement with a limited antitrust immunity. The Attorney General is required to make two findings as a condition to approving a JOA under the Act: first, one of the newspapers must be "failing," defined as a "publication which, regardless of its ownership or affiliations, is in probable danger of financial failure," 15 U.S.C. Secs. 1802(5), 1803(b); second, the JOA must "effectuate the policy and purpose" of the Act. 15 U.S.C. Sec. 1803(b). Pursuant to Department of Justice regulation, the Attorney General is to refer the JOA application to the Assistant Attorney General in charge of the Antitrust Division. The Assistant Attorney General then recommends either approval of the JOA or that a hearing be held before an administrative law judge ("ALJ"). 28 C.F.R. Sec. 48.7 (1982). If a hearing is held, the Antitrust Division becomes a party to the proceeding, id. at Sec. 48.10(b), and other interested parties may intervene, id. at Sec. 48.11. The Attorney General must base his decision on the hearing record, the ALJ's recommendation, and any exceptions filed thereto. Id. at Sec. 48.13(b).
 
 
 4
 In this case, the Attorney General followed the Antitrust Division's recommendation to hold a hearing. The Committee and other interested organizations were allowed to intervene. The hearing before Administrative Law Judge Daniel Hanscom lasted through most of November, 1981.
 
 
 5
 After reviewing the lengthy hearing record, ALJ Hanscom issued his decision recommending approval of the JOA in January of 1982. The ALJ supported his recommendation with 162 findings of fact and several conclusions of law. These findings will be discussed more thoroughly below in the context of the issues to which they pertain. For now, a brief summary will suffice. The ALJ first discussed the dominant position attained by the Times in the Seattle newspaper market. He then described the trend in this country away from competition in many major markets. Newspapers have been folding at an alarming rate; many areas which had two competing newspapers now only have one.
 
 
 6
 The ALJ then analyzed what he found to be the P-I's poor financial condition. He believed the P-I had been caught in the phenomena that is called the "downward spiral effect," in which a newspaper's declining circulation and lessening advertising revenue feed off one another, eventually forcing it to close. ALJ Hanscom did not find the evidence to support the allegations that mismanagement of the P-I by the Hearst Corporation ("Hearst") had caused the P-I's difficulties. Instead, it was the economics of the newspaper industry, highlighted by the "downward spiral effect," which led to the P-I's failing financial health. Finding the P-I's financial difficulties to be irreversible, the ALJ concluded that Hearst and the Times Company had met their burden of proving the P-I was in a state of "probable financial failure." He therefore recommended approval of the JOA. Importantly, ALJ Hanscom made this recommendation even though he found that, although Hearst had not attempted to sell the P-I and had rebuffed inquiries about a sale, the paper could in all probability be sold to a third party who would continue its independent existence.
 
 
 7
 The Attorney General followed Judge Hanscom's recommendation in spite of the opposition of the intervenors and the Antitrust Division. The Attorney General adopted all of the ALJ's findings, except for the one stating the P-I could in all probability be sold, which he did not believe to be supported by the evidence. The Attorney General's order approving the agreement was entered on June 15, 1982, and was scheduled to take full effect 10 days later.
 
 
 8
 The Committee for an Independent P-I ("the Committee" or "plaintiffs"), et al., intervenors below, immediately filed suit against Hearst, the Times Company, and the Attorney General to strike down the approval for the agreement. The district court granted the Committee's motion to stay the effective date of the Attorney General's approval of the JOA. Each side moved for summary judgment. The district court found for defendants on all issues except one. The district court concluded that the Attorney General could not validly approve the JOA when the evidence showed the alternative of a sale to a third party was possible. Judgment for the Committee was entered on August 30, 1982.
 
 
 9
 Hearst and the Times appeal. The Attorney General filed a separate appeal and the Committee cross-appeals. The three appeals were consolidated and expedited by an order of this court.
 
 II. DISCUSSION
 
 10
 There are four substantive issues presented by this action. First, what role, if any, is proof of interested third-party purchasers to play in the determination that a newspaper is in probable danger of financial failure? Second, must it be shown that the failing newspaper would probably close if the proposed joint operating agreement is not allowed? Third, must the Attorney General determine that the proposed JOA is not unnecessarily anticompetitive and that it would not impair the editorial voices of smaller newspapers in the affected market? Fourth, is the Newspaper Preservation Act unconstitutional under the first amendment?
 
 A. Standard of Review
 
 11
 Each side agrees that our review of the district court's decision is de novo. District court review of agency action is entitled to no particular deference from this court; being limited to the agency record, the district court is in no better position to review agency action than the appellate court. Asarco, Inc. v. U.S. Environmental Protection Agency, 616 F.2d 1153, 1161 (9th Cir.1980). The parties dispute, however, the proper standard of review of both the factual and legal determinations of the Attorney General. The dispute, as one might anticipate, involves how much deference the factual and legal findings of the Attorney General deserve.
 
 
 12
 We do not believe the issue of the standard of review of factual findings to be critical to our decision. The parties debate whether the arbitrary and capricious standard or the substantial evidence standard of review applies. The Attorney General argues that the Administrative Procedure Act's arbitrary and capricious standard governs our review because the Newspaper Preservation Act does not require that a hearing be held. See 5 U.S.C. Secs. 554, 556, 706(2)(E); 28 C.F.R. Sec. 48.8(c). The Committee asserts that, nevertheless, a hearing was held and the regulations require that all hearings be conducted pursuant to 5 U.S.C. Sec. 556 of the APA. 28 C.F.R. Sec. 48.10(4). In turn, the APA's substantial evidence standard applies to all "case[s] subject to section ... 556." 5 U.S.C. Sec. 706(2)(E). The Second and Seventh Circuits have held that, in the area of administrative rulemaking, the arbitrary and capricious standard of review applies when the agency conducts a hearing by virtue of its regulations rather than required by statute. Automobile Club of New York, Inc. v. Cox, 592 F.2d 658, 664 (2d Cir.1979); Amusement & Music Operators Ass'n v. Copyright Royalty Tribunal, 676 F.2d 1144, 1149-1152 (7th Cir.1982). However, we find it unnecessary to resolve this issue, as our analysis will indicate.
 
 
 13
 Review under either standard is narrowly prescribed. We do not need to decide this issue, however, because our review of the record as a whole persuades us the Attorney General's decision is supported by substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456, 462 (1951). Since we find that the Attorney General's decision was supported by substantial evidence, which allows broader appellate review than the arbitrary and capricious test, there is no question that the Attorney General did not act in an arbitrary and capricious fashion. K. Davis, Administrative Law Treatise, Sec. 29.00 at 519 (1982 Supp.); see Abbott Laboratories v. Gardner, 387 U.S. 136, 143, 87 S.Ct. 1507, 1512, 18 L.Ed.2d 681, 688 (1967).
 
 
 14
 The standard of review of legal issues presents somewhat more difficult questions. The APA mandates that the reviewing court "decide all relevant questions of law [and] interpret constitutional and statutory provisions ...." 5 U.S.C. Sec. 706. Conceding this to be the general rule, the Attorney General argues that the courts must nonetheless grant great deference to the interpretation of a statute by the agency charged with its administration. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965). We agree. The Committee correctly points out that there has not been a long-standing interpretation of the Newspaper Preservation Act. But a long-term interpretation is not a necessary precondition to our deferring to an agency's construction of a statute. Columbia Basin Land Protection Ass'n v. Schlesinger, 643 F.2d 585, 600 (9th Cir.1981). Also, the assertion that we should not defer to the Attorney General's interpretation of the Act because, in the Committee's view, he lacks substantial expertise in the antitrust field is without merit.[2] Doyon, Ltd. v. Bristol Bay Native Corp., 569 F.2d 491, 497 (9th Cir.), cert. denied, 439 U.S. 954, 99 S.Ct. 352, 58 L.Ed.2d 345 (1978).
 
 
 15
 Assuredly, our deference to the views of the Attorney General is tempered by the factors noted above. We do not imply that deference to an agency's interpretation of the law equates with blind faith. A court is obliged to accept the administrative construction of a statute only so far as it is reasonable, Columbia Basin, 643 F.2d at 600, and consistent with the intent of Congress in adopting the statute. Espinoza v. Farah Manufacturing Co., 414 U.S. 86, 94-95, 94 S.Ct. 334, 339-340, 38 L.Ed. 287, 295 (1973). Our review of the Newspaper Preservation Act and its interpretation by the Attorney General is guided by an additional rule developed out of the court's recognition of the fundamental importance of the antitrust laws--exemptions to the antitrust laws are to be narrowly construed. See, e.g., Group Life and Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 231, 99 S.Ct. 1067, 1083, 59 L.Ed.2d 261, 280 (1979).
 
 
 16
 B. Background of the Newspaper Preservation Act
 
 
 17
 The Newspaper Preservation Act was passed in July of 1970 as Public Law No. 91-353. An understanding of the circumstances leading to its passage provides substantial insight into the intent of the Act. What follows is distillation of its history, taken primarily from the House and Senate Reports. S.Rep. No. 535, 91st Cong., 1st Sess. (1969); H.R.Rep. No. 1193, 91st Cong., 2d Sess., reprinted in 1970 U.S.Code Cong. & Ad.News 3547.
 
 
 18
 In 1964, the Department of Justice began investigating joint newspaper operating arrangements. At that time, approximately 22 JOA's were in force, some dating from the 1930's. The investigation resulted in an antitrust action being filed against one such arrangement in Tucson, Arizona. The district court held the arrangement to be a violation of Sec. 1 of the Sherman Act (price fixing, profit pooling and market allocation), Sec. 2 of the Sherman Act (monopolization), and Sec. 7 of the Clayton Act (illegal merger). United States v. Citizen Publishing Co., 280 F.Supp. 978 (D.Ariz.1968).
 
 
 19
 Soon after the Citizen Publishing case was filed, a number of bills were introduced in Congress to exempt then-existing JOA's from the antitrust laws. The foremost of these was S. 1312, the Failing Newspaper Act, introduced in March, 1967, by Senator Hayden and 14 cosponsors. A similar bill, H.R. 7446, was introduced in the House by Representative Matsunaga.
 
 
 20
 In 1968, the Antitrust and Monopoly Subcommittee of the Senate Committee on the Judiciary held 21 days of hearings on S. 1312. The Subcommittee reported the bill favorably with amendments. Due to time constraints, the bill was never acted upon by the 90th Congress. The House also held hearings on its version of the bill, but did not act upon it.
 
 
 21
 In January of 1969, Representative Matsunaga and 108 cosponsors introduced another bill, H.R. 279, now called the Newspaper Preservation Act. In March of 1969, the Supreme Court affirmed the district court in Citizen Publishing v. U.S., 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969). Within two weeks, Senator Inouye introduced S. 1520 on behalf of 33 cosponsors. Three more days of hearings were held in the Senate in June of 1969. The House held hearings in September and October of 1969. Both the Senate and House Committees reported the bills favorably with amendments.
 
 
 22
 The House and Senate versions of the bill were similar in many respects. The reports emphatically state that the primary intent of the bills was to reverse the result of the Supreme Court's holding in Citizen Publishing, which strictly applied the "failing company" doctrine to newspaper JOA's. This doctrine provides a defense to otherwise illegal mergers and agreements when it is shown that one of the businesses is a "failing company," which means it is on the brink of collapse, its prospects for reorganization are dim or nonexistent, and no other noncompeting buyers are available. 394 U.S. at 137-138, 89 S.Ct. at 930-931, 22 L.Ed.2d at 155-156. The Court, in other words, applied the failing company defense quite narrowly; the JOA had to be, in the words of Justice Douglas' opinion, "the last straw." Id. Citizen Publishing did not prove it was in such dire financial straits and the JOA was held to be a clear violation of the antitrust laws. Congress attempted to reverse the result of Citizen Publishing by allowing newspapers to enter into a JOA prior to the time the financially troubled newspaper is on its deathbed. As stated by Senator Bennett: "The Court failed to articulate a doctrine which recognized the fundamental importance of placing a failing newspaper on a sound financial basis in order to preserve these two voices before there is a grave possibility of failure." 116 Cong.Rec. 1786 (1970).
 
 
 23
 Both the House and the Senate believed that authorizing certain joint action between newspapers would serve the best interest of the people of the United States and the first amendment. This interest is served by preserving the independent editorial voice of the newspaper in financial distress. Unique economic forces were considered to be at work in the newspaper industry. These forces necessitated allowing newspapers to enter joint agreements before they reached the point of distress required by Citizen Publishing. The permissible scope of a JOA is limited, however. Although the House and Senate bills allow the competing newspapers to share the business aspects of newspaper publication (printing, circulation, production facilities, advertising, revenue), the editorial and reportorial functions of the two newspapers must remain separate. See 15 U.S.C. Sec. 1802(2).
 
 
 24
 The two bills diverged in an area that is of critical importance here. This divergence involves the question of the extent of Congress' repudiation of Citizen Publishing 's failing company standard. Originally, the Senate bill defined a "failing newspaper" simply as one "not likely to remain or become financially sound." This standard was applicable to both existing JOA's and those to be entered in the future. Later, the Senate added the test that the paper be either not "financially sound" or in "probable danger of failure." See S.Rep. No. 535 at 1-2. The House considered this disjunctive definition too loosely drawn for prospective JOA's. Instead, for the purposes of future JOA's, a failing newspaper was defined as one in "probable danger of financial failure." This was the standard that was enacted into law. See 15 U.S.C. Sec. 1802(5). The Newspaper Preservation Act, modeled largely on H.R. 279, easily passed both houses in July of 1970.
 
 
 25
 This brief background of the Act provides a starting point for determining whether the Attorney General acted properly by approving the JOA at issue here. More legislative history will be discussed below, but at this point it is evident that the standard "in probable danger of financial failure" falls somewhere in between the failing company standards of Citizen Publishing and the "not likely to remain or become financially sound" definition used in the rejected Senate version of the Act.
 
 C. The Prospective Buyers Issue
 
 26
 The rejected standard of Citizen Publishing contained an element that required the failing company to show no prospective purchasers were available. 394 U.S. at 137, 89 S.Ct. at 930, 22 L.Ed.2d at 155. This required not only that the failing company accept and act on offers to purchase, but also that it make affirmative attempts to sell. 394 U.S. at 137, 89 S.Ct. at 930, 22 L.Ed.2d at 156. In this context, the district court found the Attorney General had acted improperly for two reasons: first, he incorrectly rejected the ALJ's proposed Finding of Fact 158, which stated in essence that the P-I could in all probability be sold at fair market value to a third party who would continue to operate it;[3] second, the Attorney General failed to construe the Act to require that non-anticompetitive alternatives to a JOA be explored. The facts showed the existence of interested and able purchasers, but Hearst never pursued that course. The Committee, of course, agrees with the district court. The Attorney General and Hearst believe the court erred both on the factual issue regarding the existence of ready, willing and able buyers and on the legal standard utilized. We agree with the district court to the extent it held that alternatives to a JOA are relevant to the determination that a newspaper qualifies under the Act. We find, however, that Hearst met its burden of showing that the alleged alternatives did not offer a solution to the P-I's difficulties.
 
 
 27
 We do not find the dispute concerning Finding of Fact 158 crucial to our resolution of the buyer issue. On the one hand, we agree with the Attorney General's argument that the evidence did not require him to adopt Finding of Fact 158.[4] While the evidence showed that six individuals or entities inquired into the possible sale of the P-I, it did not show that the P-I could in all probability be sold to a buyer who would continue its operation as an independent newspaper. The "inquiries" were just that: they were not offers.[5] We recognize that Hearst responded to most of these inquiries with the simple statement that the "P-I was not for sale." Hearst's failure to offer the paper for sale and to favorably respond to such inquiries does not, however, compel the conclusion made by the ALJ in Finding of Fact 158.[6]
 
 
 28
 Our affirmance of the Attorney General on the Finding of Fact 158 issue does not, as he and Hearst seem to argue, end our analysis. The facts are undisputed that purchase inquiries did occur and that Hearst did not cultivate these inquiries. See Findings of Fact 156 and 157. A close reading of the district court's decision shows that it was premised on these underlying facts and not simply on Finding of Fact 158. While we disagree with the district court's conclusion that an attempt to sell the paper is necessary to prove no reasonable alternatives to the JOA exist, we do agree that reasonable alternatives to a JOA are relevant to our analysis.
 
 
 29
 The starting point for our analysis must begin with the Congressional intent to repudiate Citizen Publishing's application of the failing company defense. We believe that Congress intended a total rejection of the failing company defense as used in Citizen Publishing, including the requirement that the applicant attempt to sell the newspaper. See, e.g., S.Rep. No. 535, supra, at 4; H.Rep., supra, 1970 U.S.Code Cong. & Ad.News at 3547, 3555; Remarks of Sen. Inouye, 116 Cong.Rec. 1785; Remarks of Sen. Bennett, Id. at 1786-1787; Remarks of Rep. Railsback, Id. at 23,154. The Federal Trade Commission opposed the Act because, among other reasons, it did not require the "search for an available purchaser." S.Rep. No. 535, supra, at 10. Holding that there is no per se sale requirement does not mean, however, that proof of interested purchasers is irrelevant.
 
 
 30
 The district court agreed that Hearst need not have attempted to sell the paper. But the court held that without such an attempt, Hearst had failed to carry its burden of proving that no reasonable alternatives to the JOA were available. The court's determination that reasonable alternatives must be explored was based on the recommended decision of Administrative Law Judge Donald Moore in a prior application under the Newspaper Preservation Act involving the Cincinnati Post. Recommended Decision of Administrative Law Judge Moore on the Application of the Cincinnati Enquirer and the E.W. Scripps Co., Department of Justice Docket No. 43-03-24-4 (1979). ALJ Moore recognized that the significance of evidence of prospective buyers was not clearly set forth in the Act's legislative history. Recommended Decision of ALJ Moore at 120. He believed, however, that Congress did intend the "probable danger of financial failure standard" to be interpreted with reference to the Bank Merger Act and the gloss put upon it by the Supreme Court in United States v. Third National Bank, 390 U.S. 171, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1967). Id. at 121. Judge Moore correctly pointed out that the Senate Report refers to the Bank Merger Act and Third National Bank for guidance in interpreting the probable danger of financial failure standard, S.Rep. No. 535, supra, at 2, as did Representative Kastenmeier, the floor leader, during the debates on the House bill, 116 Cong.Rec. 23,146.[7] Id. at 121-122. Judge Moore recognized that the actual standards used to judge the permissibility of bank mergers are quite different than the standards for newspaper JOA's. See 12 U.S.C. Sec. 1828(c)(5). He believed it was reasonable, however, to conclude that Congress intended the Supreme Court's interpretation of the Bank Merger Act in Third National Bank to be applicable to newspaper JOA's. Id. at 122-123. We agree.
 
 
 31
 The Bank Merger Act creates an antitrust exemption for certain bank mergers. The Act utilizes a balancing test, weighing the anticompetitive effects of the proposed merger against the public interest. 12 U.S.C. Sec. 1828(c)(5). In Third National Bank, the Court interpreted this balancing test to require the proponents of the merger to "reliably establish the unavailability of alternative solutions." 390 U.S. at 190, 19 L.Ed.2d at 1029. Where it had been shown that managerial deficiencies were the crux of the bank's financial difficulties, the possibility of a sale or the infusion of new management must be considered. 390 U.S. at 190-191, 88 S.Ct. at 893-894, 19 L.Ed. at 1029-1030.
 
 
 32
 Based on Third National Bank, ALJ Moore fashioned the following test to judge whether a newspaper qualifies as failing under the Act:
 
 
 33
 Accordingly, an applicant which has not sought or considered a noncompeting buyer must establish that it would be futile to require attempts to sell, either because of an unavailability of qualified purchasers or because it is unlikely that the paper's condition would be materially improved by the infusion of new ownership and new management.
 
 
 34
 Recommended Decision of ALJ Moore at 127.
 
 
 35
 Both the Attorney General and Hearst argue against Judge Moore's analysis. Specifically, they maintain that the Act utilizes a purely intrinsic economic test; alternatives in general and the presence of interested purchasers in particular are relevant, if at all, only to the extent they establish the newspaper operation is not probably failing. They contend primarily that ALJ Moore's analysis need not be considered because it was not expressly adopted by then Attorney General Civiletti. It is true that the Civiletti decision adopted only those conclusions of law necessary to the determination that the Cincinnati Post was a failing newspaper. Just what portions of Judge Moore's recommendations were necessary to his approval of the JOA is not easily answered. Nonetheless, Judge Moore presents a reasonable construction of the somewhat nebulous statements in the legislative history. While we do not adopt in whole the test he utilized, we nevertheless find that his analysis of the failing newspaper standard provides a sound foundation for our interpretation of the Act. And, as will be discussed below, our interpretation is not much different, if at all, than that proffered by the Attorney General.
 
 
 36
 As noted earlier in the discussion of the background of the Newspaper Preservation Act, the House modified the proposed Senate definition of a failing newspaper applicable to future JOA's. The probable danger standard was intended to be "far more stringent" than the financially sound standard. Statement of Rep. Kastenmeier, 116 Cong.Rec. 23,146. Representative McCulloch, a cosponsor of the House bill, stated that the antitrust exemption for future JOA's is "carefully circumscribed .... [It] should be limited only to those situations where a joint newspaper operating arrangement is demonstrably essential to prevent a newspaper failure ...." Id. at 23,148. Requiring the Attorney General to consider alternatives to the JOA effectuates the intent of Congress to create a tougher standard. We also find support for that analysis in the statements of the sponsors of the Act who described the factors one should analyze to determine if a newspaper meets the financially sound standard. These statements strongly imply that this standard was to be based solely on economic considerations. See, e.g., Remarks of Sen. Bennett, Id. at 1787; Remarks of Rep. Lloyd, Id. at 23,155; S.Rep. No. 535, supra, at 5. Hearst and the Attorney General nonetheless contend that this stricter test is still a purely economic standard; Congress intended only to require an applicant to make a stronger showing of the likelihood of failure. We disagree with that argument only to the extent that it rejects the consideration of economic factors which are arguably extrinsic to the newspaper operation.[8] We base our disagreement with this argument not only on the legislative history and our evaluation of the reasonableness of the foregoing analysis, but also on the well-recognized rule that antitrust exemptions must be narrowly construed. Group Life & Health Ins. Co. v. Royal Drug, 440 U.S. at 231, 99 S.Ct. at 1083, 59 L.Ed.2d at 280 (1979).
 
 
 37
 The Act should receive a commonsense construction. The probable danger standard is, by the plain meaning of its words, primarily an economic standard: Is the newspaper suffering losses which more than likely cannot be reversed? The existence of interested buyers may be relevant to this determination. Also, poor management practices such as concerned the Supreme Court in Third National Bank may show that, with managerial improvement, the paper's economic problems can be overcome. We noted earlier in this discussion that the Attorney General and Hearst conceded that interested purchasers may be relevant to the determination a newspaper is failing. In particular, the Attorney General does not argue strongly against either ALJ Moore's or the district court's analysis. Significantly, the Attorney General's order approving the JOA application stated that "evidence of purchaser offers or negotiations may be pertinent in assessing the financial conditions and prospects of the allegedly failing newspaper." Attorney General's Order No. 979-82 at 11. The pertinence of interested purchasers, as the Attorney General apparently concedes, may require a JOA applicant to prove that the "new ownership and management could not convert the [paper] into a profitable enterprise without resort to a joint operating arrangement." Recommended Decision of ALJ Moore at 127; see Third National Bank, 390 U.S. at 189, 88 S.Ct. at 893, 19 L.Ed.2d at 1029. This interpretation of the Act is not burdensome. Its primary effect is to prevent newspapers from allowing or encouraging financial difficulties in the hope of reaping long-term financial gains through a JOA. A JOA applicant should not be allowed to engage in poor business practices or maintain inept personnel in anticipation that it may later qualify for an antitrust exemption in the future. See S.Rep. No. 535, supra, at 5; Remarks of Sen. Bennett, 116 Cong.Rec. 1788. In this respect, "alternatives" to a JOA are relevant to both the causes of a newspaper's financial decline and its future prospects.
 
 
 38
 Our discussion is in substantial agreement with the district court's opinion. We do not agree, however, that the facts are insufficient to support the Attorney General's order. The critical question is whether it was shown that the P-I's financial condition was such that new management might be successful in reversing the P-I's difficulties. There is sufficient evidence in the record supporting a negative answer.
 
 
 39
 ALJ Hanscom made detailed findings on the condition of the P-I and the Seattle newspaper market. He found the P-I had lost over $14,000,000 since 1969, Finding of Fact 59, and that the P-I was in a "downward spiral," see Finding of Fact 130. The ALJ also rejected the argument that Hearst had mismanaged the P-I. Instead, he found the P-I management had acted competently and reasonably in an effort to return the newspaper to profitability. Finding of Fact 94. Judge Hanscom also explored numerous positive prospects and possible remedial measures proposed by the intervenors in their effort to show the P-I can be returned to profitability. He rejected them as being "ungrounded in reality." Finding of Fact 146; see also Findings of Fact 137-155. Based on these findings, we believe there is ample support in the record for the Attorney General's adoption of Finding of Fact 109, which stated:Although some of the witnesses in this proceeding were critical of the handling of the Post-Intelligencer, the evidence does not establish that new management would be any more successful than Hearst and current management of the Post-Intelligencer in returning it to profitability.
 
 
 40
 Despite Finding of Fact 109, the district court held that Hearst had not sustained its burden of proving new management could not succeed in turning the P-I around, apparently because Hearst did not respond favorably to purchase inquiries. In light of the existence of substantial evidence in support of Finding of Fact 109, this was in error. In the absence of a showing that there is a likelihood new management would succeed, Hearst's failure to consider purchase inquiries lost importance. We therefore reverse the district court's holding.
 
 
 41
 Also, the district court misperceives the proper scope of the burden of proof under the Act. It is true that the ultimate burden of persuasion lies with the proponents of the JOA. 28 C.F.R. Sec. 48.10(4) (1982). Generally, however, that burden only entails a showing of (1) the economic fact of probable failure (downward spiral, irreversible losses), and (2) reasonable management practices. In an adversarial situation such as here, parties opposed to the JOA may rebut this evidence by showing the paper's losses did not in fact exist or were due to unreasonable management practices.[9] The opponents also might offer, as they did here, proof of parties interested in purchasing the newspaper. This evidence might show the paper is not actually in probable danger of failure because reasonable changes can return the paper to profitability.[10] When the proponents of the JOA established, as they did here, that the paper was managed reasonably and its trend toward failure is irreversible under any management, we have no difficulty concluding that the burden of proof has been met. Cf. Third National Bank, 390 U.S. at 189, 88 S.Ct. at 893, 19 L.Ed.2d at 1029 (where proof adduced at trial showed "failing" bank's problems were due to mismanagement, bank had burden of showing reasonable attempts to solve management difficulties were made, or that they would be unlikely to succeed).
 
 D. Proof of Probable Closure
 
 42
 As an alternative ground for overturning the approval of the Post-Intelligencer/Times joint operating agreement, the Committee contends that the Attorney General failed to interpret the Act to require proof the P-I would be closed if the JOA application were disapproved. The district court held for defendants on this issue. It found it sufficient the Attorney General concluded that, but for the ownership of Hearst, the P-I would probably be closed. We agree.
 
 
 43
 For purposes of this issue, we accept the Committee's assertion that Hearst never considered closing the P-I, even should the joint operating agreement not be allowed. Our focus, however, is on other language in the failing newspaper definition not yet discussed. A newspaper is defined as failing if it is in probable danger of financial failure "regardless of its ownership or affiliations." 15 U.S.C. Sec. 1802(5). This language supports the ALJ's and the Attorney General's conclusion that the financial strength of Hearst need not be considered in determining whether the P-I is failing. We therefore agree with the district court's resolution of this issue: substantial evidence establishes that the P-I is in dire financial trouble and, without the backing of Hearst, it would probably close.
 
 
 44
 We do not dispute the Committee's assertions that a primary intent of the Newspaper Preservation Act was to promote the diversity of editorial voices among newspapers. Congress was of the opinion that unique economic forces operate in the newspaper industry, forces which caused the decline and closure of numerous newspapers since the turn of the century. S.Rep. No. 535, supra at 2-3; H.Rep. No. 1193, supra, at 3548-3549. In order to maintain editorial diversity, it is beyond question that the purpose of the Act is to prevent the closure of the ailing newspaper. See, e.g., Remarks of Sen. Goldwater, 116 Cong.Rec. 1795; Remarks of Sen. Ellender, Id. at 1785; Remarks of Sen. Inouye, Id. at 1786; Remarks of Rep. Matsunaga, Id. at 23,153; Remarks of Rep. McCulloch, Id. at 23,148. We note, however, that Congress was just as concerned with the loss of an independent editorial voice through a merger, as with an actual closure of a newspaper. Remarks of Rep. Matsunaga, supra.
 
 
 45
 We do not accept Hearst's argument that requiring proof of probable closure is the same as requiring the paper be on the brink of collapse, an element of the "failing company" defense which was clearly repudiated by the Newspaper Preservation Act. We adhere to our belief that Congress intended the phrase "probable danger of failure" to mean a probability that the paper would be closed and an editorial voice lost. We do not agree, however, with the Committee's assertion that proof of probable closure is a per se rule applicable to all JOA applications. Our conclusion that Congress intended that there be a showing the newspaper will likely close must be interpreted in light of the language that a newspaper's failing status should be determined without regard to its ownership or affiliations.
 
 
 46
 We believe the intent of the "regardless of ownership" language is quite clear. It means simply that the ailing newspaper should be analyzed as a free-standing entity, as if it were not owned by a corporate parent. The legislative history does not contradict the plain meaning of this language. The Senate Report concisely describes the purpose of this language:
 
 
 47
 The phrase "regardless of its ownership or affiliations" was included to focus the attention of the court on the business entity before it rather than the related business enterprises. Whether a newspaper is failing should be determined on the basis of the operation in the particular city rather than on the basis of the sweep of the newspaper owner's business interests. However, the phrase shall not preclude court examination of transactions between the newspaper seeking exemption and related companies which supply goods and services or which are customers. If such examination were precluded, it would make it possible to create [a] "failing newspaper" by artificial bookkeeping entries and that is not intended.
 
 
 48
 S.Rep. No. 535, supra, at 5. Similarly, Senator Hruska stated the purpose of this language was to insure that judicial interpretation on the question whether a paper is failing be "based upon the financial operations of that paper, and not upon the presence or absence of financial support from other newspaper business activities in other cities or from other financial activities of the owners of the failing newspaper." 116 Cong.Rec. 2006; see also Remarks of Reps. Eckhardt and Kastenmeier, Id. at 23,147; cf. Letter from Paul Rand Dixon to Sen. James Eastland (July 25, 1969), attached to S.Rep. No. 535, supra, at 9-11 (Mr. Dixon, then the Chairman of the Federal Trade Commission, objected to the passage of the Act because, among other reasons, "[e]very failing newspaper may enter a joint operating arrangement without reference to the identity or financial resources of its owner or owners.")
 
 
 49
 We find that the above-quoted portion of the Senate Report sums up the importance of the phrase "regardless of ownership or affiliations" quite well: generally, ownership is not to be a factor in considering whether a newspaper is failing; an exception to the general rule is that ownership may be analyzed to ensure the owner has not created a failing company through creative bookkeeping. The Committee apparently does not dispute that the P-I as a separate entity is in financial trouble. It instead asserts that, based on an "incremental analysis," Hearst is receiving net benefits from the P-I's financial problems for tax and other reasons. As the Attorney General held, these arguable benefits to Hearst do not counter that the P-I, as a separate entity, is in severe financial trouble and would likely close if not owned by Hearst. We affirm the district court on this issue.
 
 E. Harm to Competing Newspapers
 
 50
 The Committee also argues that the order approving the JOA must be overturned because the Attorney General did not consider the potential injury to other newspapers in the market and did not limit the terms of the JOA to the least anticompetitive approach possible. The argument is that these conditions are implied in the requirement that the Attorney General find that the JOA "effectuate[s] the policy and purpose of the Act." The district court held against the Committee on this issue. For the following reasons, we affirm.
 
 
 51
 The policy of the Act is stated in its first section. That policy is to maintain editorial and reportorial independence among newspapers through the preservation of newspaper publication in areas "where a joint operating agreement has been heretofore entered into because of economic distress or is hereafter effected in accordance with the provisions of this chapter." 15 U.S.C. Sec. 1801. This declaration and the legislative history compel the conclusion that the Act itself is a policy determination that the preservation of editorial diversity through joint operating agreements outweighs any potentially anticompetitive effects this antitrust exemption might cause. Congress struck the balance in favor of the Act notwithstanding opposition that decried the potential harm to smaller, usually suburban newspapers competing in the market area. As stated in the House Report: "Although commercial competition may have been affected to some extent by these arrangements, they have achieved the more important objective of preserving separate editorial voices." H.Rep. No. 1193, supra, at 3549. Representatives MacGregor and Mikva objected to the Act because "[i]t will preserve certain newspapers but will stifle competition in ideas by crippling the growth of small newspapers and preventing successful establishment of competing dailies." Id. at 3558; see also Remarks of Rep. MacGregor, 116 Cong.Rec. 23,149-50; Remarks of Sen. McIntyre, Id. at 1815-1817.
 
 
 52
 The Act itself contains an important safeguard which prevents the parties to a JOA from engaging in any conduct which would violate the antitrust laws if done by a single entity. 15 U.S.C. Sec. 1803(c). As explained in the Senate Report, this section is designed "to protect the competitive position of newspapers which share the market with a joint operating arrangement." S.Rep. No. 535, supra, at 5. It can easily be garnered from this and the other language cited above that Congress considered the question of harm to other newspapers and resolved it in favor of the antitrust exemption.[11]
 
 
 53
 We reject the argument that the terms of the proposed JOA do not effectuate the policy and purpose of the Act.[12] Title 15 U.S.C. Sec. 1802(2) discloses the proper subjects of a newspaper joint operating agreement. Joint action with respect to the following is allowed: sharing printing and production facilities; joint business, advertising and circulation departments; the setting of circulation and advertising rates; and revenue distribution. The express limit on this joint activity is that editorial and reportorial functions must remain separate and independent. The Attorney General found and the Committee does not seriously dispute that the proposed JOA meets these restrictions. It is evident that Congress determined what it considered to be the permissible scope of a newspaper JOA. Again, opponents of the Act argued against it because they felt it was an unnecessary and broad exemption from the antitrust laws. See S.Rep. No. 535, supra, at 7 and 10 for the FTC's objections that the Act placed no time limits on potential JOA's. Representatives MacGregor and Mikva voiced a similar objection. H.Rep. No. 1193, supra, at 3557.
 
 
 54
 We conclude that the district court correctly rejected the Committee's claims on this issue. Congress recognized that the approval of a JOA may have anticompetitive ramifications. This was a national policy choice Congress was free to make. It believed those possibly harmful effects were outweighed by other considerations and sufficiently alleviated by the requirements of the Act. The JOA is not inconsistent with the Act.
 
 F. First Amendment Issues
 
 55
 The Committee also argues the Newspaper Preservation Act as a whole is invalid by virtue of the first amendment. The challenge is two-pronged: first, that the Act is invalid as applied because approval of the JOA would impair the first amendment rights of smaller newspapers in the market; second, that the Act is invalid on its face as an overbroad and vague delegation of power in an area affecting first amendment rights. Although these arguments are imaginative, they lack substantial merit.
 
 
 56
 The district court rejected the claim that the Act is unconstitutional as applied, basing its decision largely on two district court decisions dealing with the same argument. Bay Guardian v. Chronicle Publishing Co., 344 F.Supp. 1155 (N.D.Cal.1972); City and County of Honolulu v. Hawaii Newspaper Agency, Inc., 7 Media L.Rep. (BNA) 2495 (D.Hawaii 1981). We agree with the district court's rejection of the Committee's assertion that these cases are distinguishable because the plaintiffs there were challenging preexisting joint operating agreements. In either situation, the courts are faced with the claim that this antitrust exemption may cause economic injury to smaller newspapers, which might lessen circulation, which in turn affects the "breadth" of one's freedom of press.
 
 
 57
 It is obvious that the Newspaper Preservation Act's antitrust exemption will not affect the content of speech of these smaller newspapers. The Act is an economic regulation which has the intent of promoting and aiding the press. At most, the Act may affect the number of "readers" a newspaper has. But that the Act may have such an effect is no different, in our view, than any other economic regulation of the newspaper industry. Associated Press v. NLRB, 301 U.S. 103, 132-133, 57 S.Ct. 650, 655-656, 81 L.Ed. 392 (1937); Mabee v. White Plains Publishing Co., 327 U.S. 178, 184, 66 S.Ct. 511, 514, 90 L.Ed. 607, 613 (1946); Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 193-194, 66 S.Ct. 494, 497-498, 90 L.Ed. 614, 620-621 (1946).
 
 
 58
 Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1935), is cited by the Committee in support of its first amendment argument. In Grosjean, the Supreme Court struck down a statute which imposed a special tax on newspapers having a circulation of over 20,000 copies. The court overturned the statute not because it had an economic impact on newspapers but because it was designed to stifle opposition to the Louisiana political machine. Simply put, this facially neutral statute was intended to regulate the content of speech. Nor is Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), on point. There the Court held only that the first amendment does not insulate news-gathering organizations from the antitrust laws.
 
 
 59
 Whether or not the Newspaper Preservation Act's limited antitrust exemption should be considered a license, as the Committee argues, we do not find first amendment rights implicated. While we recognize the importance of the antitrust laws in our economic system, one cannot lose sight that these laws are the creation of Congress. They are not mandated by the first amendment or anywhere else in the Constitution. What Congress has passed, it may repeal. Apparently, the Committee's actual dissatisfaction with the Act is based on its belief that certain newspapers are treated differently, i.e., preferentially. But there is no question that other newspapers in the Seattle area, large or small, may participate in a joint operating agreement if they qualify.
 
 
 60
 Finally, we see no "vague and overbroad" delegation of power to the Attorney General. First of all, as discussed above, we fail to see any clearly defined first amendment injury. Secondly, our interpretation of the Act rejects the argument that it is overly vague. The Attorney General must base his approval of a proposed JOA on the requirements in the Act as we have interpreted them in this opinion. Nothing more definite is required. See, e.g., Arnett v. Kennedy, 416 U.S. 134, 159, 94 S.Ct. 1633, 1646, 40 L.Ed.2d 15, 36 (1974).
 
 III. CONCLUSION
 
 61
 We agree with the district court to the extent it held that the alternatives to a joint operating agreement, including sale to a capable noncompeting buyer, are relevant to the determination that a newspaper qualifies for an antitrust exemption under the Newspaper Preservation Act. It is evident, however, that the Times Company and Hearst sufficiently negated the possibility that any such alternatives were available in this case. We reverse the district court for that reason.
 
 
 62
 The other arguments in support of overturning the Attorney General's approval of the Post-Intelligencer's joint operating agreement are better placed before Congress. The Newspaper Preservation Act was not intended to create antitrust immunities for any newspapers which simply allege they are having difficulties. However, neither does it contain an array of implied conditions which in effect would reinstate the Citizen Publishing standards. Simply put, we will not emasculate the Act in the guise of narrowly construing it. We therefore affirm the district court on the issues raised by the Committee's cross-appeal.
 
 
 63
 Costs are awarded to appellants.
 
 The decision of the district court is
 
 64
 AFFIRMED IN PART and REVERSED IN PART.
 
 
 
 [1]
 The Newspaper Preservation Act provides:
 Sec. 1801. Congressional declaration of policy
 In the public interest of maintaining a newspaper press editorially and reportorially independent and competitive in all parts of the United States, it is hereby declared to be the public policy of the United States to preserve the publication of newspapers in any city, community, or metropolitan area where a joint operating arrangement has been heretofore entered into because of economic distress or is hereafter effected in accordance with the provisions of this chapter.
 Sec. 1802. Definitions
 As used in this chapter--
 (1) The term "antitrust law" means the Federal Trade Commission Act and each statute defined by section 4 thereof as "Antitrust Acts" and all amendments to such Act and such statutes and any other Acts in pari materia.
 (2) The term "joint newspaper operating arrangement" means any contract, agreement, joint venture (whether or not incorporated), or other arrangement entered into by two or more newspaper owners for the publication of two or more newspaper publications, pursuant to which joint or common production facilities are established or operated and joint or unified action is taken or agreed to be taken with respect to any one or more of the following: printing; time, method, and field of publication; allocation of production facilities; distribution; advertising solicitation; circulation solicitation; business department; establishment of advertising rates; establishment of circulation rates and revenue distribution: Provided, That there is no merger, combination, or amalgamation of editorial or reportorial staffs, and that editorial policies be independently determined.
 (3) The term "newspaper owner" mean[s] any person who owns or controls directly, or indirectly through separate or subsidiary corporations, one or more newspaper publications.
 (4) The term "newspaper publication" means a publication produced on newsprint paper which is published in one or more issues weekly (including as one publication any daily newspaper and any Sunday newspaper published by the same owner in the same city, community, or metropolitan area), and in which a substantial portion of the content is devoted to the dissemination of news and editorial opinion.
 (5) The term "failing newspaper" means a newspaper publication which, regardless of its ownership or affiliations, is in probable danger of financial failure.
 (6) The term "person" means any individual, and any partnership, corporation, association, or other legal entity existing under or authorized by the law of the United States, any State or possession of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any foreign country.
 Sec. 1803. Antitrust exemptions
 (a) It shall not be unlawful under any antitrust law for any person to perform, enforce, renew, or amend any joint newspaper operating arrangement entered into prior to July 24, 1970, if at the time at which such arrangement was first entered into, regardless of ownership or affiliations, not more than one of the newspaper publications involved in the performance of such arrangement was likely to remain or become a financially sound publication: Provided, That the terms of a renewal or amendment to a joint operating arrangement must be filed with the Department of Justice and that the amendment does not add a newspaper publication or newspaper publications to such arrangement.
 (b) It shall be unlawful for any person to enter into, perform, or enforce a joint operating arrangement, not already in effect, except with the prior written consent of the Attorney General of the United States. Prior to granting such approval, the Attorney General shall determine that not more than one of the newspaper publications involved in the arrangement is a publication other than a failing newspaper, and that approval of such arrangement would effectuate the policy and purpose of this chapter.
 (c) Nothing contained in the chapter shall be construed to exempt from any antitrust law any predatory pricing, any predatory practice, or any other conduct in the otherwise lawful operations of a joint newspaper operating arrangement which would be unlawful under any antitrust law if engaged in by a single entity. Except as provided in this chapter, no joint newspaper operating arrangement or any party thereto shall be exempt from any antitrust law.
 Sec. 1804. Reinstatement of joint operating arrangements previously adjudged unlawful under antitrust laws
 (a) Notwithstanding any final judgment rendered in any action brought by the United States under which a joint operating arrangement has been held to be unlawful under any antitrust law, any party to such final judgment may reinstitute said joint newspaper operating arrangement to the extent permissible under section 1803(a) of this title.
 (b) The provisions of section 1803 of this title shall apply to the determination of any civil or criminal action pending in any district court of the United State[s] on July 24, 1970, in which it is alleged that any such joint operating agreement is unlawful under any antitrust law.
 
 
 [2]
 The Committee also argues that we should not defer to the Attorney General's interpretation of the Newspaper Preservation Act when there has been a prior interpretation inconsistent with his present view of the Act. See United States v. Leslie Salt Co., 350 U.S. 383, 396, 76 S.Ct. 416, 423, 100 L.Ed. 441, 451 (1956); Power Brake Company v. United States, 427 F.2d 163, 164 (9th Cir.1970). We agree with that proposition but, as will be discussed below, we do not believe the prior interpretation is substantially different from what Attorney General Smith presently believes to be a proper interpretation of the Act
 
 
 [3]
 Finding of Fact 158 provides:
 Considering that the Post-Intelligencer is not, and has not been for sale, and that all inquiries regarding possible purchase have been rebuffed by The Hearst Corporation with statements to that effect, and that responsible prospective purchasers nevertheless continue to appear and express an interest in buying the Post-Intelligencer, it must be concluded that the Post-Intelligencer could in all probability be sold at fair market value to a person or firm who could, and would, continue it in operation as an independent metropolitan daily.
 
 
 [4]
 We must emphasize that in this situation our review is of the Attorney General's decision, not the ALJ's. When the agency disagrees with the ALJ, deference still runs in favor of the agency; the ALJ's contrary findings will simply be weighed along with the other evidence opposing the agency's decision. See, e.g., NLRB v. Brooks Camera, Inc., 691 F.2d 912, 915 (9th Cir.1982)
 
 
 [5]
 There was evidence of seven purchase inquiries. Apparently, all the inquiries were by individuals or groups who had the potential means to back up any offers they might have made. Briefly, the nature of these inquiries and Hearst's response were as follows:
 (1) In 1975, a Mr. Bailey asked the P-I's Seattle attorney what the asking price of the P-I was. The P-I privately advised Mr. Bailey that the paper was not for sale.
 (2) In 1976, Mr. Eller made a similar inquiry and received a similar response.
 (3) Mr. Cunningham made an inquiry in 1977. He was also told the paper was not for sale.
 (4) In 1978, Mr. Guzzo, on behalf of another party, asked Hearst whether the paper was for sale. Hearst replied it was not.
 (5) In May of 1981, after the proposed JOA was announced, Mr. Cunningham made another inquiry. While Hearst replied it had no present intention of selling, it did state it would carefully consider any responsible bona fide offer. No offer was ever submitted.
 (6) In October of 1981, Rupert Murdoch stated that if the JOA failed to go through, he would like to be considered as a buyer.
 (7) On November 24, 1981, a Mr. Snellman made it known that he was interested in buying the P-I at a price to be set by an appraiser. This inquiry was made on the last day testimony was to be taken at the hearing and after the close of the intervenor's case. The closing date for the hearing was set for November 28. The ALJ allowed the letter indicating Mr. Snellman's interest into evidence but, due to the last minute nature of the offer and time constraints, did not allow Mr. Snellman to testify. Apparently, Hearst never responded to this late inquiry.
 Findings of Fact 156 and 157.
 
 
 [6]
 Our review on this point is narrow: Was it proper to reject Finding of Fact 158? We will discuss in more detail below the ramifications of Hearst's failure to hold the paper up for sale and its rebuff of potential buyers. For now, we should note that the requirement of attempting to sell the financially distressed company was one of the Citizen Publishing requirements rejected by the Newspaper Preservation Act
 
 
 [7]
 In reference to the amendment which disjunctively added the danger of probable failure standard to the unlikely to remain financially sound definition of a failing paper, the report states: "This phrase is taken from the Bank Merger Act and has been the subject of a Supreme Court opinion in U.S. v. Third National Bank."
 Rep. Kastenmeier, in response to the objection that the probable danger standard was loosely drawn, stated: "The term ... is one that has a legislative history. It comes out of the Bank Merger Act. It is understood by the courts in the field, and happens to be a term that is well known."
 
 
 [8]
 There are few, if any, things that affect a business's success which can truly be characterized as noneconomic. A good example is the political viewpoint of a publisher. That viewpoint certainly shows up in the editorial policies of a newspaper. Those policies in turn may either attract or reduce readership. We do not wish to imply that a newspaper must explore the alternative of changing its editorial policies prior to entering a JOA. The Attorney General and Hearst tend to argue that any factors extrinsic to the newspaper operation are "noneconomic." That, however, is a shortsighted view, and we reject it so far as it leads to the conclusion that proof of interested purchasers is "noneconomic" and therefore irrelevant under the Act
 
 
 [9]
 We note that the Antitrust Division will always be a party when a hearing is held. Other interested parties may intervene. 28 C.F.R. Sec. 48.10(b). Also important is the requirement that the applicants for a JOA must provide substantial financial documentation concerning their newspapers to the Attorney General. 28 C.F.R. Sec. 48.4. This information is generally open to public view and could be used to rebut an applicant's evidence. In fact, the intervenors did rely on that information in attacking the proposed JOA. Also, interested buyers could have used this information to come up with a reasonable plan to return the paper to profitability
 
 
 [10]
 The Committee argues that because parties are interested in purchasing the P-I, it cannot actually be failing. Various bits of legislative history are cited in support of this contention. We disagree, however, with this argument which, in effect, states that a newspaper that meets the definition of failing under the Act cannot be sold. The statements of various congressmen more closely relate to the belief that once a newspaper reaches the point of financial difficulty required by Citizen Publishing, the paper may very well have little value as an acquisition or as a party in a proposed JOA; it may very well be more advantageous for the dominant paper to let the ailing paper die and enjoy the benefits of a natural monopoly rather than entering a joint agreement. See, e.g., House of Representatives Hearings before the Antitrust Subcommittee on H.R. 279, 91st Cong., 1st Sess. 12 (1969); S.Rep. No. 535, supra, at 4; Remarks of Sen. Inouye, 116 Cong.Rec. 1786, Remarks of Rep. Annunzio, Id. at 23,168; cf. Remarks of Rep. Feighan, Id. at 23,156 (objects to the Act for the reason it will allow a paper to be considered failing even though it could be sold)
 Also, on December 15, 1982, the Committee requested this court to take judicial notice of the sale of a Hearst newspaper, the Boston Herald-American, allegedly in "probable danger of failure," to the News America Publishing Company. We deny this request. Based on our interpretation of the Act, this sale is not relevant to the determination that the Post-Intelligencer is in probable danger of financial failure.
 
 
 [11]
 The Committee's only support for its position is a statement by Senator Dirksen during the Senate hearings. Senator Dirksen's amendment added the requirement of Attorney General approval for prospective JOA's. He explained: "In this way, the interest of the suburban papers and the unions will be considered by the Justice Department before any new arrangements are authorized." Senate Hearings before the Antitrust and Monopoly Subcommittee on S. 1520, 91st Cong., 1st Sess. 5 (1969). Senator Dirksen later explained his intent in proposing this amendment: "Before authorizing such arrangements in the future, the Department could hear from other interested parties--competing papers, unions, etc.--as well as make its own investigation, in order to be certain the new arrangement is essential and justified." Id. at 9. Although Senator Dirksen's statements do not refer to the requirement that the JOA "effectuate the policy and purpose of the Act," it is evident he intended primarily to allow interested parties a chance to voice their views. The regulations adopted by the Attorney General permit this and that is what in fact happened in the proceedings below
 
 
 [12]
 The Committee's primary objection is that the agreement is too long (50 years) and that it will not cease to exist even if the P-I becomes profitable in the future