MICHIGAN CITIZENS FOR AN INDE-
PENDENT PRESS, et al., Plaintiffs,

v.

ATTORNEY GENERAL OF the
UNITED STATES, et al.,
Defendants.

Civ. A. No. 88–2322.

United States District Court,
District of Columbia.

Sept. 14, 1988.

William B. Schultz, David C. Vladeck, Public Citizen Litigation Group, Washington, D.C., for plaintiffs.

John Stuart Smith, Nixon, Hargrave, Devans & Doyle, Washington, D.C., for Detroit News.

David J. Anderson, Thomas Millet, Dept. of Justice, Washington, D.C., for Dept. of Justice.

Philip A. Lacovara, Gerald Goldman, Hughes, Hubbard & Reed, Clark M. Clifford, Robert A. Altman, Clifford & Warnke, Washington, D.C., for Detroit Free Press.

Edward B. Cohen, Davis Wright & Jones, Paul Friedman, Anne Smith, White & Case,

W. Terry Maguire, Claudia James, American Newspaper Publishers Ass'n, Washington, D.C., P. Cameron DeVore, Shelly Shapiro, Davis Wright & Jones, Seattle, Wash., Philip Anderson, Peter Kumpe, Wright, Lindsey & Jennings, Little Rock, Ark., amicus curiae.

## MEMORANDUM OPINION AND ORDER

REVERCOMB, District Judge.

This case is a challenge to a decision by former Attorney General Edwin Meese III to approve a joint operating agreement ("JOA") under the Newspaper Preservation Act ("NPA") of 1970, 15 U.S.C. §§ 1801–1804 (1982). The JOA would give the newspapers, the *Detroit Free Press* ("Free Press") and *The Detroit News* ("News"), limited exemption from antitrust laws.

Attorney General Meese granted the application for a JOA between the two newspapers on August 8, 1988. Eight days later, and two days before the JOA was to begin in operation, this suit was filed by plaintiffs, a group that includes individuals, advertisers, and newspaper employees who allege that they would be adversely affected by the JOA. On August 17, 1988, Judge Joyce Hens Green of this Court, sitting as motions judge, granted plaintiffs' motion to stay the effect of the Attorney General's decision until September 17, 1988. Judge Green held that "at this early stage of these proceedings the record suggests the conclusion that the Attorney General's Decision and Order was arbitrary and capricious," but that "[u]pon a full ventilation of these matters a different conclusion might be reached." Opinion and Order Granting Stay at 15.

Pursuant to a schedule ordered by Judge Green, oral argument was heard on cross-motions for summary judgment on September 8, 1988. For the reasons stated herein, the Court grants defendants' motion for plenary summary judgment and will allow the stay to expire.

## I. Background

The Detroit metropolitan area is the only urban center in the nation, save New York, with two general interest daily newspapers with circulations of more than 650,000 each. The Free Press, owned since 1940 by Knight–Ridder, Inc., the nation's second-largest newspaper group, and the News, run since 1986 by Gannett Co., Inc., America's largest newspaper organization, have engaged since roughly 1960 in what has been nicknamed "The Great Newspaper War." Unlike the numerous other newsprint battles in American cities since World War II, however, the Detroit contest has not resulted in a clear winner and a clear loser. Indeed, since 1970 the Free Press has never captured less than 47 percent nor greater than 50 percent of the combined daily circulation market. By virtue of the newspaper war, the papers are the least expensive major dailies in the nation, both for buyers and advertisers, and Detroit has the highest per capita newspaper readership rate of any major metropolitan area.

By 1980, however, the management of each paper was deeply concerned that their publication would fall behind and suffer the fate of many other once-robust but now-extinct "second" newspapers. With each paper convinced that its publication could be the one to survive, each engaged in costly strategies to try to achieve "market domination." Each cut prices, discounted its advertising rates, and made significant capital investments, including the opening of a new printing plant by the Free Press in 1986.

Despite consistent profits during the 1970s, both publications have suffered operating losses throughout the 1980s, although those of the Free Press have been more consistent. On May 9, 1986, not long after Gannett purchased the News, the two newspapers petitioned the Attorney General for permission to work under a JOA, which includes a provision for only one newspaper to be published on weekends. Since then, the Free Press's losses have deepened, so that the paper now contends it is losing between $34,000 and $45,000 a day, even though circulation has not fallen off significantly.

After receiving the application for the JOA, the Attorney General referred the matter to the Assistant Attorney General in Charge of the Antitrust Division, then Douglas H. Ginsburg, who recommended on July 23, 1986 both that the application be denied and that the matter be presented to an administrative law judge ("ALJ"). Pursuant to 28 C.F.R. § 48.10 (1986), the Attorney General referred the matter to ALJ Morton Needelman, who conducted three weeks of evidentiary hearings. On December 29, 1987, Judge Needelman presented a 129-page Recommended Decision ("Recommended Decision") that including exhaustive findings of fact and again recommended that the JOA be denied. Attorney General Meese on August 8, 1988 issued a Decision and Order ("Decision and Order") granting the application for a JOA. Although he "accepted as accurate the fact findings of the Administrative Law Judge," Attorney General Meese "differed ... with his ultimate conclusion as to where those facts lead." Decision and Order at 14. Judge Green's order stayed the effect of the Attorney General's Decision and Order, which otherwise would have permitted the JOA to go into effect under the NPA on August 18, 1988.

## II. The Newspaper Preservation Act

Concerned over the failing of many "second" newspapers in major metropolitan areas in the 1950s and 1960s, Congress in 1970 enacted the Newspaper Preservation Act ("NPA"), 15 U.S.C. §§ 1801–1804 (1982). The NPA grants a partial antitrust exemption to newspapers that enter into a JOA, in which the newspapers merge their business operations and jointly set prices and advertising rates. At the same time, the editorial and reporting functions remain separate, so that two different newspapers, presumably with two fairly separate editorial voices, continue to be published.

The key requirement for the Attorney General's approval of a JOA is that one of the papers be a "failing newspaper," defined as a publication that, "regardless of its ownership or affiliations, is in *probable danger of financial failure.*" 15 U.S.C.

§ 1802(5) (emphasis added). The "failing newspaper" test was clearly intended to replace the more stringent "failing company" defense for mergers generally permitted under antitrust law. Specifically, Congress wished to reverse the effects of *Citizen Publishing Co. v. United States,* 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969), in which the United States Supreme Court held that JOAs violated antitrust restrictions unless one publication was "on the verge of going out of business." *Id.* at 137, 89 S.Ct. at 930. The purpose of the NPA is to allow the partial merger of two newspapers before the failing one becomes too ill to revive. In the application for the Detroit JOA, the Free Press was offered as the "failing newspaper."

Under the NPA, a JOA with an antitrust exemption must get prior approval of the Attorney General, who may approve the JOA if "approval of such arrangement would effectuate the policy and purpose" of the act. 15 U.S.C. § 1803(b). The statute offers no further guidance to this broad latitude granted to the Attorney General; instead, the Department of Justice ("DOJ") has adopted rules to govern consideration of JOA applications. 28 C.F.R. pt. 48 (1987). The rules include provision for an administrative law judge ("ALJ") to make a "recommendation" to the Attorney General. 28 C.F.R. § 48.10(d).

## III. Judicial Review

Plaintiffs receive judicial review of the Attorney General's decision under the Administrative Procedure Act ("APA"), which directs the reviewing court to set aside agency action and conclusions when, among other situations, they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The court may set aside agency action because it is "unsupported by substantial evidence" only in a case "reviewed on the record of an agency hearing *provided by statute.*" *Id.* § 706(2)(E) (emphasis added). Since the NPA does not provide for a hearing, only the "arbitrary" or "capricious" test is ap-

plicable here. *See, e.g., Camp v. Pitts*, 411 U.S. 138, 140–41, 93 S.Ct. 1241, 1243, 36 L.Ed.2d 106 (1973) ("substantial evidence" test not used when a hearing is held pursuant only to agency regulations); *Maryland Department of Human Resources v. Department of Health and Human Services*, 763 F.2d 1441, 1451 n. 7 (D.C.Cir.1985).

This Court takes the words "arbitrary" and "capricious" seriously, noting that they constitute a highly deferential standard of review that presumes the validity of authorized action and requires affirmance if the action is supported by a rational basis. *See, e.g., Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414–21, 91 S.Ct. 814, 822–26, 28 L.Ed.2d 136 (1971). Moreover, although this Court must give a thorough examination to the reasons and the record, the Court is *not* entitled to substitute its judgment for that of the authorized official, even if the Court would have decided the other way under a weight of the evidence standard. *See, e.g., Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823. Finally, the Court is mindful of the fact that the plaintiff has the burden of proving that the Attorney General's action fails under this standard.

## IV. Applying the Arbitrary and Capricious Standard

Plaintiffs' contention that the Attorney General's decision was arbitrary and capricious consists of three broad arguments. First, plaintiffs argue that the Attorney General was unreasonable in finding that the Free Press is a "failing newspaper" under the requirements of the NPA. Second, plaintiffs allege that the Attorney General was not entitled to give any substantial weight to crucial testimony supporting the notion that the Free Press was in imminent danger of failure. Third, plaintiffs maintain that the Free Press and the News cannot be allowed to take advantage of a JOA since the business strategies of the applicants have been in part improperly guided by the prospect of a JOA. Finally, plaintiffs also contend that there were improper ex parte contacts by defendants during the Attorney General's consideration of this matter. Plaintiffs' contentions fail on all four points.

### 1. The Failing Newspaper Standard

■ The plaintiffs' first argument challenges the Attorney General's finding that the Free Press is in "probable danger of financial failure," the test for a failing newspaper under the NPA. Plaintiffs maintain that the newspaper is not "failing," citing uncontested findings of the ALJ that the Free Press is not dominated by the News, that the Free Press is not in a "downward spiral" of circulation and advertising revenue, and that both the Free Press and the News theoretically could be profitable with higher circulation and advertising prices. The Attorney General admitted that the Free Press does not meet the traditional scenario of a downward-spiraling failing newspaper, but concluded nonetheless that "the danger of financial failure claimed by the *Free Press* appears to be every bit as real" as if it were following the traditional scenario. Decision and Order at 6.

This Court cannot hold that the Attorney General was arbitrary or capricious in finding that the traditional downward spiral, although a common symptom of a "failing newspaper," is not necessary to prove a "failing newspaper." The Court keeps in mind that a reviewing Court must grant considerable deference to the interpretation and construction of a statute by the official authorized to administer it, even if there are more than one possible interpretation or construction. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). Moreover, the Attorney General's position here is bolstered by the NPA's stated policy to "preserve [through JOAs] the publication of newspapers" that would otherwise fail. 15 U.S.C. § 1801 (1982). It would make little sense to hold that a newspaper should be denied a JOA and forced to close because of financial reasons simply because the

publication had not entered a stereotypical "downward spiral."

The "failing newspaper" test must be, as the Attorney General noted, a matter of probabilities, not certainties. Indeed, the only appellate case construing the test held that the "probable danger" standard is, "by the plain meaning of its words, primarily an economic standard: Is the newspaper suffering losses which more than likely cannot be reversed?" *Committee for an Independent P–I v. Hearst Corp.*, 704 F.2d 467, 478 (9th Cir.) (approving the Attorney General's decision to grant a JOA in Seattle), *cert. denied*, 464 U.S. 892, 104 S.Ct. 236, 78 L.Ed.2d 228 (1983).

The Attorney General presented ample support, under the arbitrary and capricious standard, for his finding that the Free Press is both "suffering losses which more than likely cannot be reversed" and is in "probable danger of financial failure." The ALJ found, and the Attorney General noted, that the Free Press has suffered at least $56 million in operating losses since 1980 (losses that have accelerated nearly every year), that there is *no* unilateral policy available that could extricate the Free Press from its loss situation, and that were it not for massive infusions of funds from its parent, Knight–Ridder, the Free Press would likely already have failed. The NPA instructs the Attorney General to consider the financial condition of the newspaper "regardless of ownership"—an order to view the newspaper as "a free-standing entity, as if it were not owned by a corporate parent." *Hearst*, 704 F.2d at 480. Since it is not disputed that the Free Press is caught in an serious loss position, with no unilateral way out, the Attorney General had sufficient support, under the "arbitrary" or "capricious" test, for his conclusion that the Free Press is in "probable danger of financial failure."

Plaintiffs rest their argument here on the prediction of the ALJ that if the JOA is denied, the News, which is also suffering losses, will raise its prices, the Free Press will quickly follow, and both will once again bask in the sun of profitability. Plaintiffs also cite approvingly the findings of the ALJ about the long-term advantages of the Free Press and the consistent optimism of the Free Press management in the years before the JOA application was filed. Furthermore, plaintiffs argue, with some support from the ALJ, that the current losses of the Free Press are best characterized as a capital investment designed to reap future profits, should the Free Press become dominant.

These predictions about a bright future, however, must be tempered by three crucial points. First, the Attorney General was not unreasonable in concluding that there is no reason to expect the News to raise its prices any time soon, considering that such a move would put at risk its narrow circulation advantage, which in turn could jeopardize its position as the financially healthier Detroit daily, and considering that the management of the News has stated that it has no intention of raising prices. Second, the ALJ's long-term speculation comes with no timetable and no guarantee of probability, and does nothing to change the Free Press's *current* status as in "probable danger of financial failure." A company may have decent long-term prospects and still fail, either because the long-term prospects are too uncertain or remote, or because short-term losses are too severe to continue to suffer. The NPA does not require that a newspaper publisher suffer massive losses by keeping the publication in business during unprofitable years simply because of the prospect of future profitability. Third, even if the Free Press did make significant capital expenditures in the hope of future profits, this fact does not prevent it from becoming a "failing newspaper" if the losses proved to be longer-lasting or more severe than anticipated, or if the hope for future profits now appears to be unwarranted. Indeed, even the ALJ stated that the Free Press is stuck in a deficit position and that there is no unilateral strategy it could follow to extricate itself. Accordingly, this Court finds that the Attorney General was not arbitrary or capricious in concluding that the Free Press is a "failing newspaper."

## 2. The Disputed Testimony

■ Although the current financial situation of the Free Press is adequate to support the Attorney General's conclusion, plaintiffs complain that the Attorney General improperly credited a crucial portion of the testimony before the ALJ of Alvah Chapman, Jr., chief executive officer of Knight–Ridder, Inc., parent of the Free Press. Mr. Chapman testified that he would recommend closing the newspaper if the JOA were not granted. Calling it a "bolt out of the blue," the ALJ discounted the testimony entirely, apparently viewing it as simply a strategic maneuver and a "threat," because there were no previous indications that the Free Press would follow such a drastic path. Recommended Decision at 93–94. The Attorney General disagreed with the ALJ's assessment, stating that it would be "neither counterintuitive nor contradictory for Knight–Ridder to follow such a course." Decision and Order at 10.

Testimony such as this is always problematic, as there is a great incentive to provide self-serving evidence. Were it clear that this testimony were a "bluff," the Attorney General should have discounted it accordingly. If the threat is real, however, the proper positions of the Attorney General and of the reviewing Court are not so clear, even if the decision to close the Free Press were made in hopes of swaying the JOA decision. On one hand, the government should discourage potential manipulative decisionmaking on the part of newspaper publishers. On the other hand, a publisher can close its newspaper whenever it chooses—whether it is justified in doing so because of financial losses, whether it does so because its "bluff" is called and it wants to preserve its credibility, or whether it is propelled *both* by the pain of losses and the potential pleasure of JOA profits.

In the instant case, fortunately, the Court does not need to grapple fully with these problems. The Attorney General concluded that the testimony should not be disregarded entirely—a conclusion bolstered by the undeniable fact of massive losses from which the Free Press cannot extricate itself unilaterally, and by the stake of Knight–Ridder, Inc., the nation's second-largest newspaper company, in its credibility and reputation. Even if the assessment of the ALJ were also reasonable, this Court cannot find that the Attorney General's decision to give at least some weight to the testimony of Knight–Ridder's CEO was unreasonable, arbitrary, or capricious.

## 3. The Motivations of the Newspapers

■ The third major argument of plaintiffs is that the JOA must be denied because the losses suffered by the Free Press are in part the result of a conscious strategy of forcing prices so low that it would either drive its competitor out of business or cause losses that would permit a JOA. Both the policy behind the NPA and the *Hearst* opinion justify the notion that purposely incurred losses should not be recognized in justifying a "failing newspaper." See *Hearst,* 704 F.2d at 478. Indeed, whenever government offers a benefit because of financial hardship—be it welfare applicant or failing newspaper—there is always an incentive for the potential recipient to either exaggerate or exacerbate its woes in order to receive the benefit.

Here, there is no dispute that the losses of the Free Press are real, nor that they have been incurred primarily as the result of a bold strategy that the publication hoped would lead it to a dominant position in the Detroit market. Rather, the contention is more subtle; the suggestion of the ALJ was that both newspapers felt free to adopt bold strategies of price-cutting in an effort to gain market domination because they were secure in the belief that "failure 'too had its reward in the form of JOA approval." Recommended Decision at 114, 128.

The Attorney General's response to this allegation was disconcerting, in that it failed to address the subtlety of the dual motive issue. Rather, the Attorney General set up what amounts to a straw man by stating incompletely that the "suggestion is that the prospect of a JOA, not competition for market domination, was respon-

sible" for the newspapers' current strategies. Decision and Order at 13. He then concluded that the record "makes abundantly clear that the strategy followed by both papers has been in place for nearly a decade, and the heavy expenditure of investment capital by Knight–Ridder over that period of time belies the notion that it was principally pursuing any end other than market domination." *Id.* (citation omitted). Unless the word "principally" implicitly recognizes the dual motive argument, the Attorney General failed to address directly a key concern of both the ALJ and the chief of the Justice Department's Antitrust Division.

Nevertheless, this reviewing Court cannot conclude that the Attorney General, who is granted broad latitude under the NPA to effectuate the "policy and purpose" of the act, was arbitrary or capricious in finding that the Free Press's conduct did not disqualify it from a JOA. The ALJ's evidence shows that the prospect of a JOA played at most a secondary or supporting role in the newspapers' motivations. The Court believes that the policies behind the NPA would be best fulfilled by allowing a JOA when the newspaper's losses are *primarily* the result of acceptable, competitive strategies, and are only marginally prompted by the prospect of a JOA should the strategies fail.

On one hand, newspapers should not be allowed, to quote the ALJ, to "engage in a whole panoply of risky strategies secure in the knowledge that the reward for failure—a JOA—may be just as valuable as, say, a successful attempt at monopolization." Recommended Decision at 122. On the other hand, the policies behind the NPA —saving newspapers that are failing after a good-faith effort to keep them afloat— would *not* be fulfilled if a newspaper were forced to fail, without a JOA, when the predominant impetus behind the newspaper's strategy has been competition. It could be argued that this Court's policy may encourage "gambling" by newspapers in the future, but it will permit JOAs in situations where a city might otherwise lose a newspaper entirely.

In the Detroit case, the ALJ's findings, on which plaintiffs rely completely, show only a secondary role for the prospect of a JOA in the Free Press's strategic decision-making. Indeed, they suggest that the newspaper may have followed the same strategies had the JOA not been available. Considering this record, this Court cannot conclude that the Attorney General was arbitrary or capricious in finding that the newspaper's behavior was acceptable enough to qualify it for a JOA.

Finally, plaintiffs argue that the Attorney General's decision was fatally flawed because it was "internally inconsistent" in purporting to both accept the fact findings of the ALJ and disagree with the ALJ's findings about the newspapers' strategic motivations. This argument fails for two reasons. First, it is not clear that the Attorney General disagreed with the ALJ's fact findings as much as his inferences derived from facts. Second, since the Attorney General makes clear his view that the newspapers were not engaged "principally" in ends other than competitive ones, the Court cannot fault him for a blanket phrase in his conclusion—not in his discussion—that he accepted the findings of fact. To overturn the Attorney General on this point would be review by semantic technicality.

### 4. Ex Parte Contacts

◼ In their complaint, plaintiffs allege that the Attorney General was a target of unlawful ex parte contacts while he was considering the JOA application. Specifically, the plaintiffs contend that numerous letters were sent to the Attorney General, that the Attorney General discussed the JOA application at a meeting with a group of congressmen on June 7, 1988, and that the defendant publications engaged in a "public relations" campaign to achieve their goal of a JOA. In a signed declaration, former Attorney General Meese has rebutted each of these allegations first, he states that the Justice Department kept all ex parte letters away from him; second, he states that he refused to discuss the merits of the case at the June 7 meeting; third, he states that he never discussed the JOA

with anyone outside of the Justice Department. As plaintiffs failed to add anything to their bald allegations in their motion for summary judgment and subsequent filings, the Court must grant defendants summary judgment on the ex parte issue.

## V. Conclusion

It is not the duty of this Court to weigh the arguments of the ALJ in this matter against those of the Attorney General; the only authorized role for this Court under the NPA and APA is to determine whether the Attorney General's conclusions were arbitrary or capricious, using the ALJ's findings as a background record. The Court finds that the Attorney General was not unreasonable in finding that the Free Press—a newspaper that has incurred, and will continue to incur, losses that would already have led to its demise were it not owned by a large corporate parent—is a "failing newspaper," using the NPA definition of "probable danger of financial failure" and the *Hearst* standard of losses "not likely to be reversed." Furthermore, the Court finds that the Attorney General was not unreasonable in concluding that the Free Press was primarily motivated by competitive aims, not a JOA, in its recent business strategies. Therefore, this 14th day of September, 1988, plaintiffs' motion for summary judgment is hereby DENIED, defendants' motion for plenary summary judgment is hereby GRANTED, and the stay on the Attorney General's Decision and Order will be allowed to expire on September 17, 1988 at 7:15 p.m.