**MICHIGAN CITIZENS FOR AN INDE-
PENDENT PRESS, et al., Appellants**

v.

**Richard THORNBURGH, United States
Attorney General, et al.**

No. 88–5286.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 28, 1988.

Decided Jan. 27, 1989.

Rehearing Denied Feb. 24, 1989.*

* See 868 F.2d 1300.

William B. Schultz, with whom David C. Vladeck and Alan B. Morrison, Washington, D.C., were on the brief, for appellants.

Clark M. Clifford, with whom Robert A. Altman, Robert P. Reznick, Philip A. Lacovara and Gerald Goldman, Washington, D.C., were on the brief, for appellee The Detroit Free Press, Inc.

Douglas Letter, Atty., Dept. of Justice, with whom John R. Bolton, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Washington, D.C., were on the brief, for appellee Thornburgh, Atty. Gen., et al. Robert K. Kopp also entered an appearance for the Atty. Gen.

Lawrence J. Aldrich, John Stuart Smith, and Gordon L. Lang, Washington, D.C., were on the brief, for appellee The Detroit News, Inc.

Paul L. Friedman and Anne D. Smith, Washington, D.C., were on the brief, for amicus curiae Little Rock Newspapers, Inc. urging reversal.

W. Terry Maguire and Claudia James, Washington, D.C., were on the brief, for amicus curiae American Newspaper Publishers Ass'n urging affirmance.

Before ROBINSON, RUTH BADER GINSBURG, and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Dissenting opinion filed by Circuit Judge RUTH BADER GINSBURG.

SILBERMAN, Circuit Judge:

This case presents a challenge to a decision and order of the Attorney General, pursuant to the Newspaper Preservation Act ("NPA"), 15 U.S.C. §§ 1801–1804 (1982), approving a joint operating arrangement between the Detroit Free Press and Detroit News newspapers. Appellants, which include Michigan Citizens For An

Independent Press,[1] seven individuals,[2] and the interest group Public Citizen, brought suit against the Attorney General and the two newspapers in the district court alleging that the Attorney General's decision violates the NPA and the Administrative Procedure Act, 5 U.S.C. § 706 (1982), because it is not based on substantial evidence, is arbitrary and capricious, and is otherwise in violation of law. The district court granted summary judgment in favor of defendants, 695 F.Supp. 1216, and plaintiffs appealed to this court. We conclude that the Attorney General's decision was based on a permissible construction of the statute, and that his application of the legal standard to the facts of this case was not arbitrary, capricious, or an abuse of discretion. We therefore affirm the judgment of the district court.

## I.

### A.

Congress passed the Newspaper Preservation Act in 1970 with the stated purpose of "maintaining a newspaper press editorially and reportorially independent and competitive in all parts of the United States." 15 U.S.C. § 1801. The Act creates an exemption to the antitrust laws that permits a joint newspaper operating arrangement ("JOA")[3] between two newspapers if the Attorney General determines that one of the papers is "a failing newspaper" and that the arrangement will "effectuate the policy and purpose" of the Act. 15 U.S.C. § 1803(b).[4] A "failing newspaper" is defined as "a newspaper publication which, regardless of its ownership or affiliations, is in probable danger of financial failure." 15 U.S.C. § 1802(5).

The first joint newspaper operating arrangement was started by three newspapers in Albuquerque, New Mexico in 1933, and by 1966 there were twenty-two JOAs in effect. In 1964, the Department of Justice initiated an investigation of newspaper JOAs, and in 1965 it sued the publishers of two daily newspapers in Tucson, Arizona, which operated jointly, for violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 and section 7 of the Clayton Act, 15 U.S.C. § 18. The trial court in that suit found violations of all of those provisions, and the Supreme Court upheld that finding in *Citizen Publishing Co. v. United States*, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969).

The Court rejected the newspapers' argument that the so-called "failing company" defense—a judicially created doctrine—absolved them from liability under the antitrust laws. *Id.* at 137–38, 89 S.Ct. at 930. Under the "failing company" doctrine, conduct which would otherwise violate antitrust laws does not do so if one of the suspect businesses "faced the grave proba-

---

1. At the time this suit was filed, Michigan Citizens For An Independent Press had twenty members who either read, purchase classified advertising in, or are employed by one of the newspapers.

2. The seven individual plaintiffs include persons who purchase advertising in the papers and allege that advertising prices will rise if the JOA is approved.

3. The Act defines a "joint newspaper operating arrangement" as "any contract, agreement, joint venture (whether or not incorporated), or other arrangement entered into by two or more newspaper owners for the publication of two or more newspaper publications, pursuant to which joint or common production facilities are established or operated and joint or unified action is taken or agreed to be taken with respect to any one or more of the following: printing, time, method, and field of publication; allocation of production facilities; distribution; advertising solicitation; circulation solicitation;

business department; establishment of advertising rates; establishment of circulation rates and revenue distribution: *Provided*, that there is no merger, combination, or amalgamation of editorial or reportorial staffs, and that editorial policies be independently determined." 15 U.S.C. § 1802(2).

4. The entire provision reads as follows:
 It shall be unlawful for any person to enter into, perform, or enforce a joint operating arrangement, not already in effect, except with the prior written consent of the Attorney General of the United States. Prior to granting such approval, the Attorney General shall determine that not more than one of the newspaper publications involved in the arrangement is a publication other than a failing newspaper, and that approval of such arrangement would effectuate the policy and purpose of this chapter.

bility of business failure." *International Shoe Co. v. FTC,* 280 U.S. 291, 302, 50 S.Ct. 89, 93, 74 L.Ed. 431 (1930). The doctrine is based on the notion that a merger between two competitors, one of which is failing, cannot have an adverse effect on competition, because the failing company would disappear as a competitive factor whether or not the merger occurred.

In *Citizen Publishing,* the Court narrowly confined the scope of the doctrine. It held that a financially troubled company may not employ the "failing company" defense unless it meets three conditions. The disputed merger may be sought only when the owners of the "failing" company are contemplating liquidation; indeed, the JOA must be the "last straw" at which the company can grasp. 394 U.S. at 137, 89 S.Ct. at 930. The defendants are required to establish that the company that acquires the failing company is "the only available purchaser," *id.* at 138, 89 S.Ct. at 931, and finally, the prospects for successful reorganization under the bankruptcy laws must be "dim or nonexistent." *Id.* Because the Tucson papers did not make such a showing, their JOA violated the Sherman Act.

Congress reacted to *Citizen Publishing* by passing the Newspaper Preservation Act, which established a less stringent test for newspapers seeking a JOA. S. REP. No. 535, 91st Cong., 1st Sess. 4 (1969). Congress did not question the Court's reasoning in defining the failing company doctrine, but it felt that "the economics of the newspaper industry make it more likely for newspapers to fail when faced with competition than other businesses." *Id.* As the Senate Judiciary Committee noted, "when a newspaper is failing it is harder to reverse the process and it is almost impossible to find an outside buyer." *Id.* The NPA therefore provides that a newspaper is "failing" and eligible for a JOA when it is "in probable danger of financial failure." 15 U.S.C. § 1802(5). The statute also in-

cludes what Congress meant to be a less strict standard for JOAs already existing in 1970. H.R. REP. No. 1193, 91st Cong., 2d Sess. 10 (1970), U.S.Code Cong. & Admin. News 1970, p. 3547. A pre-statute JOA is not unlawful if at the time at which such arrangement was entered into, not more than one of the newspapers involved was "likely to remain or become a financially sound publication." 15 U.S.C. § 1803(a).

Since 1970, four new JOAs have been approved and implemented.[5] In each of those cases, unlike the Detroit case, the "failing newspaper" was well into what in the newspaper industry is known as the "downward spiral." The fate of a struggling newspaper is thought to be determined by the close interrelationship between circulation and advertising revenues. Once a paper loses circulation, advertisers are less likely to purchase space in the paper. Readers, in turn, are less likely to buy a paper that is short on advertising, so circulation drops further. The result of this interrelationship is an apparently irreversible downward plunge that ends in business failure. The only court to address the Act, *Committee for an Independent P–I v. Hearst Corp.,* 704 F.2d 467 (9th Cir.), *cert. denied,* 464 U.S. 892, 104 S.Ct. 236, 78 L.Ed.2d 228 (1983), concluded that a newspaper in the downward spiral satisfies the "probable danger of financial failure" test, as long as it had followed reasonable management practices. *Id.* at 479.

### B.

The Detroit Free Press and the Detroit News are daily newspapers that compete in Detroit, which is the nation's fifth largest newspaper market. The papers are owned by the two largest news organizations in the United States; Knight–Ridder, Inc. owns the Free Press, and the Gannett Company has controlled the News since February 1986, when it purchased the paper from the Evening News Association. Over the

---

5. Opinion and Order Regarding Application of Seattle Times Co. and Hearst Corp. for Approval of Joint Operating Arrangement, 417 Fed.Reg. 26,472 (1982); Newspaper Operating Arrangement—Times Printing Co., and the Chattanooga News–Free Press Co., 45 Fed.Reg. 58,733 (1980);

Cincinnati Post and Cincinnati Enquirer, Approval of Joint Operating Arrangement, 44 Fed. Reg. 68,537 (1979); Anchorage Daily Times and the Anchorage Daily News: Findings on Application for Approval of Joint Operating Arrangement, 39 Fed.Reg. 41,754 (1974).

past fifteen years, the papers have been engaged in fierce competition for absolute dominance of the Detroit market, which was motivated, at least initially, by the knowledge that many junior papers have been unable to survive as the second paper in metropolitan area competition.

This bitter fight has led to large operational losses by both papers. The Free Press has lost money every year since 1979, and it lost over $10 million per year from 1981 to 1986. The News has sustained operational losses since 1980, and it lost over $50 million between 1981 and 1986. A circulation price war has driven the daily prices in Detroit to twenty cents for the News and fifteen cents for the Free Press—probably the lowest daily prices in the United States. In recent years, the News has maintained a consistent circulation lead of approximately 51% to 49%. Perhaps more important, the News has continuously maintained more than a 60% share of total full-run advertising linage.

As a result of their losses, the papers began to consider the alternative of a JOA as early as 1980 when the chief executive officers of Knight–Ridder and the Evening News Association first discussed the possibility. Negotiations continued sporadically from January 1981 to January 1984, but no agreement was reached during that period. In August 1985, Gannett agreed in principle to purchase the News from the Evening News Association, and senior officials of Gannett and Knight–Ridder thereafter met 16 times between August 1985 and April 1986 to shape the final agreement. On April 11, 1986 the News and the Free Press executed the JOA.

The agreement, which has an initial term of 100 years, provides—as is typical—that the news and editorial staffs of the two papers are to remain independent and insulated from influence by the other party to the arrangement. The Free Press would publish a morning paper on Monday through Friday, and the News would print a corresponding afternoon edition. On Saturday and Sunday, the parties would publish only one paper, with each paper assuming separate editorial and news responsibilities.

During the first three years of the JOA, the News would receive 55% of the profits of the combined enterprise, while the Free Press would receive 45%. In the fourth and fifth years, the profit split would reduce to 53%/47% and 51%/49%, respectively. Beginning in the sixth year, the profits and losses would be shared equally by the News and the Free Press.

On May 9, 1986, the two papers applied for approval of the JOA by the Attorney General as required by the Act, and the application was referred to the Assistant Attorney General in charge of the Antitrust Division, pursuant to Justice Department regulations. *See* 28 C.F.R. § 48.7 (1988). The then Assistant Attorney General, Douglas H. Ginsburg (now Judge Ginsburg), issued a report on July 23, 1986, concluding that the applicants had "not yet sustained their burden of proof of showing that the Detroit Free Press is a 'failing newspaper' within the meaning of the Act and that approval of the application would effectuate the policy and purpose of the Act." However, he did not advise disapproval of the application; instead, he recommended that the Attorney General order that a hearing be held before an administrative law judge to resolve material issues of fact raised by the application. *See* 28 C.F.R. § 48.7(b)(2) (1988).

Attorney General Edwin Meese followed his Assistant Attorney General's advice and pursuant to the Justice Department's regulations, 28 C.F.R. § 48.10, an administrative law judge was appointed to conduct the hearing. On December 29, 1987, ten months later, the ALJ issued a decision, recommending that the application be denied. He concluded, *inter alia*, that the applicants had failed to prove that there exists in Detroit an irreversible market condition that will probably lead to the failure of the Free Press. According to the ALJ, the Free Press is not dominated by the News and the Free Press is not in a downward spiral toward failure. He instead attributed the losses incurred by the Free Press and the News to "their strategies of

seeking market dominance and future profitability at any cost along with the expectation that failure to achieve these goals would result in favorable consideration of a JOA application."

The ALJ did not deny that the fiercely competitive strategies employed by both papers were perfectly rational, given the disastrous history of junior papers in the United States. But he believed that each paper had an eye on a potential JOA application in the event that it turned out to be the loser. They both saw the JOA as a safety net, in other words, and were thereby encouraged to engage in particularly risky competitive acrobatics.

Indisputably, the News was leading the Free Press in most of the circulation, revenue, and advertising linage figures used to measure the relative positions of rival newspapers. The ALJ maintained, however, that the Free Press was within "striking distance" of the total circulation lead, and that the News' advertising lead was "vulnerable" to a change in the circulation lead. Neither paper could achieve profitability as long as they both pursued the current price war, but he believed that the record did not support the conclusion that "reader and advertiser demand in Detroit is so inadequate that the market cannot sustain two profitable papers irrespective of changes in pricing policies." He hypothesized that Detroit could sustain two profitable papers if the Free Press and the News both raised circulation and advertising prices. Still, he recognized that since "neither the Free Press nor the News can raise circulation or advertising prices without regard to what the other paper does, there is no completely unilateral course of action which either paper can pursue which would return it to profitability."

The ALJ accepted the testimony of the Antitrust Division's expert, who calculated that the 50/50 profit split (after five years) represented a perception by Gannett that it could not achieve domination of the market for "at least seven years." He was, moreover, unpersuaded by Gannett officials' testimony that if the JOA were denied, they would *not* raise circulation prices, and he found "contemporaneous evidence" indicating that "absent a JOA Gannett may eventually initiate circulation price increases." He also assigned "little weight" to testimony from Knight–Ridder's CEO that he would close down the Free Press if the JOA application were denied. Essentially, the ALJ predicted that if the JOA were denied, the News would give the Free Press sorely needed relief by raising the News' circulation and advertising prices, thereby allowing the Free Press to follow suit.

Attorney General Meese, in his opinion of August 8, 1988, disagreed with the conclusions of the ALJ and granted approval of the JOA. The Attorney General "accepted as accurate the fact findings of the Administrative Law Judge," but differed with his "ultimate conclusion as to where those facts lead." Adopting the legal standard enunciated by the Ninth Circuit in *Hearst* the Attorney General asked: "Is the newspaper suffering losses which more than likely cannot be reversed?" *Committee for an Independent P-I v. Hearst,* 704 F.2d 467, 478 (9th Cir.), *cert. denied,* 464 U.S. 892, 104 S.Ct. 236, 78 L.Ed.2d 228 (1983). The Attorney General decided that the answer was yes: the Free Press had met its burden of proof, because it had suffered persistent operating losses over nearly a decade and had no prospect of unilateral action to reverse those losses.

Central to the Attorney General's opinion was his disagreement with the ALJ's prediction of future behavior by the two papers in the event that the JOA is denied. He noted and accepted the ALJ's finding that the News was in a stronger competitive position according to all major economic indices. But he determined—or more accurately predicted—that if the News continues its current pricing practices, it "undoubtedly has the ability on such terms to outlast the Free Press." Given this premise, the Attorney General found persuasive Gannett's testimony that it would continue its current competitive policies (and not raise prices), which he said "hardly reflects unsound business judgment." Similarly, the Attorney General felt that the testimony of Knight–Ridder's CEO concerning a

possible closure of the Free Press "cannot be wholly disregarded," because it would be "neither counterintuitive nor contradictory" for Knight–Ridder to discontinue the paper if it concluded that it could not outlast the News in a prolonged price war.

In response to the allegation that the papers had pursued their competitive strategies *because* of the potential of a JOA, the Attorney General read the record as showing that Knight–Ridder was not *"principally* pursuing any end other than market domination." (emphasis added). Moreover, he noted that "newspapers cannot be faulted for considering and acting upon an alternative that Congress had created."

## II.

 Appellants allege that the Attorney General's determination is invalid both because it is based on an impermissible interpretation of the statute and is arbitrary or capricious.[6] As is not unusual in appeals from agency actions, the claims are interrelated. At the core of appellants' case is the assertion that the Attorney General could not legally grant approval for a JOA because the Detroit Free Press was not in a tough enough spot to qualify as "in probable danger of financial failure." Whether the Attorney General legally decided that the Free Press did meet the statutory standard in turn depends to a large extent on whether his prediction of the newspapers' future course (if he did not approve the JOA) was reasonable. The Attorney General's interpretation of the probable danger of financial failure test draws content from the factual showing that he requires to meet that test. *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 107

S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987) (ambiguous statutory terms "can only be given concrete meaning through a process of case-by-case adjudication"). And there is no question in our mind that if the Attorney General's statutory interpretation is reasonable, it is entitled to deference under *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), because we are certainly unable to discern a specific congressional intent governing this case.

Not surprisingly, the exact meaning of the linguistically imprecise phrase "probable danger of financial failure" is not apparent from the statute or the legislative history. The Senate bill, which differed slightly from the House version, "defined" a failing newspaper as one "in danger of probable failure." The Senate took this phrase—or at least the words "probable failure"—from the Bank Merger Act, 12 U.S.C. § 1828(c)(3) (1982), recognizing that the phrase was informed by the Supreme Court's decision in *United States v. Third National Bank,* 390 U.S. 171, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968). S.Rep. No. 535, 91st Cong., 1st Sess. 2 (1969). The House version, which was eventually adopted, used the clause "probable danger of *financial* failure" as the standard for new JOAs (emphasis added). Despite its minor difference from the Senate version, the chief House sponsor of the bill explained that "[t]he term 'probable danger of financial failure' ... comes out of the Bank Merger Act," and "is understood by the courts in the field." 116 Cong.Rec. 23,146 (1970) (statement of Rep. Kastenmeier). The Supreme Court had held in *Third National Bank* that where managerial deficiencies are responsible for a bank's financial prob-

---

6. Appellants argue at some length that parts of the decision should be reviewed under the "substantial evidence" test of section 706(2)(E) of the APA rather than the "arbitrary or capricious" standard, because the Attorney General based his conclusions on a record compiled after a formal hearing. The substantial evidence test applies, though, only in cases where "an agency hearing [is] provided by statute." 5 U.S.C. § 706(2)(E) (1982); *see CNA Financial Corp v. Donovan,* 830 F.2d 1132, 1153 (D.C.Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1270, 99 L.Ed.2d 481 (1988); *Maryland Dept. of Human*

*Resources v. Department of HHS,* 763 F.2d 1441, 1451 n. 7 (D.C.Cir.1985). The Newspaper Preservation Act does not require that a hearing be held; a hearing is provided for only in the Justice Department's regulations. 28 C.F.R. § 48.10 (1988). In any event, we reiterate that in the view of this court, the "meaning of the 'substantial evidence' terminology connotes a substantive standard no different from the arbitrary or capricious test." *Association of Data Processing Orgs., Inc. v. Board of Governors,* 745 F.2d 677, 685 (D.C.Cir.1984).

lems, the banks, in order to prove "probable failure," must establish that improved management could not achieve profitability. 390 U.S. at 190, 88 S.Ct. at 893. More generally, the parties seeking the merger must "reliably establish the unavailability of alternative solutions" to the financial woes of the failing bank. *Id.* Thus, strong evidence of probable failure was required.

■ To be sure, the Attorney General had not previously faced a case such as this. Prior approvals of JOAs had always involved at least one newspaper that had actually entered the downward spiral, whereas the Detroit Free Press could be said to be poised on the brink of the spiral, its future dependent on the competitive behavior of the *News*.[7] Still, the only prior case reviewing an Attorney General's approval of a JOA—the pre-*Chevron* decision of the Ninth Circuit in *Hearst*—phrased the question before the Attorney General in broader terms than whether one of the newspapers had entered a downward spiral. The court asked: "Is the newspaper suffering losses which more than likely cannot be reversed?" This interpretation of the statutory language, which the court called a "commonsense construction," *id.* at 478, was explicitly adopted by the Attorney General in this case, and thus made his own interpretation entitled to *Chevron* deference. Only for cogent reasons would we reject as unreasonable an interpretation of a statute that a sister circuit had considered a commonsense construction.

The Ninth Circuit thought implicit in its inquiry was an examination of alternative forms of relief for the putatively failing newspaper. Was there, for example, a group of interested buyers or a potential for improved management? Congress' reference to the *Third National Bank* case in the legislative history of the statute suggested to the Ninth Circuit that Congress

intended the Attorney General to consider alternatives to a JOA before approving an application. We quite agree, but so apparently did the Attorney General. He concluded that if no form of relief was within the control of the sick newspaper—its survival depended only on improbable behavior by its competitor—the statutory test was satisfied. Appellants artificially construe the Attorney General's decision to permit a JOA without regard to consideration of the competitors' behavior, but that is not what the Attorney General said.

■ The dissent suggests that the Attorney General's statutory construction is impermissible because it did not employ the interpretative canon that exemptions to the antitrust laws—like all exemptions—should be construed narrowly. *Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 231, 99 S.Ct. 1067, 1083, 59 L.Ed. 2d 261 (1979). Certainly, courts interpreting the antitrust statutes have often employed that canon. *See, e.g., Hearst,* 704 F.2d at 473 ("Our review of the Newspaper Preservation Act and its interpretation by the Attorney General is guided by [the] additional rule ... [that] exemptions to the antitrust laws are to be narrowly construed.").[8] But *Chevron* implicitly precludes courts picking and choosing among various canons of statutory construction to reject reasonable *agency* interpretations of ambiguous statutes. If a statute is ambiguous, a reviewing court cannot reverse an agency decision merely because it failed to rely on any one of a number of canons of construction that might have shaded the interpretation a few degrees in one direction or another.

We do not mean to say that canons of construction are completely irrelevant in the post-*Chevron* era. If employment of an accepted canon of construction illustrates that Congress had a *specific* intent

---

**7.** Appellants deny that they claim that only a newspaper in a downward spiral may qualify under the statutory test. But their argument seems necessarily to imply just that, since it is based on the notion that the Free Press' losses and the News' continued strength in circulation and advertising are not sufficient objective

factors to support the Attorney General's decision.

**8.** The pre-*Chevron* decision of the *Hearst* court did mention deference, 704 F.2d at 473, but does not seem really to have deferred to the Attorney General's construction.

on the issue in question, then the case can be disposed of under the first prong of *Chevron.* *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 448–49, 107 S.Ct. 1207, 1222, 94 L.Ed.2d 434 (1987) ("ordinary canons of statutory construction" provided "compelling" evidence that Congress intended "well-founded fear or persecution" standard to be different from "clear probability of persecution."). For example, if Congress banned the importation of apples, oranges, and bananas from a particular country, the canon of *expresio unius est exclusio alterius* might well indicate that Congress *did not* intend to ban the importation of grapefruits. In that event, an agency decision to ban grapefruits would be contrary to Congress' specific intent. As a corollary, we held in *American Fed'n of Gov't Employees v. FLRA,* 798 F.2d 1525, 1528 (D.C.Cir.1986), that the FLRA's interpretation of the Federal Service Labor–Management Relations Statute was impermissible because it "ignore[d] the familiar canon that statutes should be construed 'to give effect, if possible, to every word Congress used.'" The FLRA's construction had resulted in "an effective repeal" of part of the statute, *id.* at 1529, and thereby frustrated the intent of Congress.

■ In this type of case by contrast, the Attorney General is called upon to balance two legislative policies in tension: The pro-consumer direction of the antitrust laws and a congressional desire embodied in the Newspaper Preservation Act that diverse editorial voices be preserved despite the unique economics of the newspaper industry. This is precisely the paradigm situation *Chevron* addressed. If the agency's choice "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Chevron,* 467 U.S. at 845, 104 S.Ct. at 2783 (quoting *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)). To invoke the normal canon of construction is merely to say that the Attorney General put too much weight on the

policy of preserving editorial diversity. We are not now after *Chevron*—if we ever were—permitted to accept such an argument.

■ Appellants argue that the Attorney General should receive less deference than *Chevron* requires, because "his interpretation of the statute was different from that of the Antitrust Division, where the Justice Department's expertise on the Newspaper Preservation Act resides." We have previously rejected the notion that *Chevron* deference is based solely on agency expertise. *Public Citizen v. Burke,* 843 F.2d 1473, 1477 (D.C.Cir.1988); *Cablevision Systems Dev. Co. v. Motion Picture Ass'n of America,* 836 F.2d 599, 608–09 (D.C.Cir.1988). The rationale of *Chevron* is also grounded in the principle that the political branches of government, rather than the judiciary, should make policy choices. *Chevron,* 467 U.S. at 865–66, 104 S.Ct. at 2793.

Nevertheless, our dissenting colleague seems to accept the argument, since she relies heavily on the Antitrust Division's brief submitted to the ALJ. Dissent at 1298 n. 3, 1299 n. 5, 1299 n. 6. It is not surprising that the Division—charged with the front line responsibility for enforcing the antitrust laws—sought a narrow interpretation of sections 1802(5) and 1803(b). Congress, however, did not place responsibility for reconciling the conflicting policies and values called for in this type of case upon the Antitrust Division, but rather on the Attorney General, who might be thought to have a broader perspective.

■ It is also suggested, dissent at 1299, that the Attorney General's decision is legally defective because he did not explain his interpretation of the conceptual difference between the section of the statute that applied to this transaction and the section that did *not* apply. The latter, section 1803(a), governs the legality of prestatute JOAs and is more lenient because a JOA is authorized if, when entered into, not more than one of the newspapers involved was "likely to remain or become a financially sound publication." We do not understand our dissenting colleague to argue

that the Attorney General's interpretation of section 1803(b) necessarily overlaps section 1803(a). A financially sound publication might, for instance, be defined as one that is consistently profitable, indeed, profitable enough to recover its cost of capital. That is worlds away from a newspaper that is "suffering losses which more than likely cannot be reversed." The dissent contends, instead, that the Attorney General was obliged to draw the exact boundaries between the two sections when applying only the one. That seems to us to require an agency to decide cases not before it, to offer dicta that we normally eschew. We know of no authority that would support such a holding.

### III.

■ Even if the Attorney General is statutorily authorized to treat a newspaper as in probable danger of failing before it actually enters the downward spiral, appellants claim that the Attorney General's decision was arbitrary and capricious because not rationally connected to the facts before him. *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)) (agency must articulate a "rational connection between the facts found and the choice made"). This, as we have noted, is in essence a challenge to the reasonableness of the Attorney General's determination that the News had the economic power to outlast the Free Press and was not likely to reduce competitive pressure by raising prices.

■ The only specific challenge, as far as we can determine, to the Attorney General's appraisal of the respective competitive strengths of the two newspapers is based on the different opinion of the ALJ

(and the Antitrust Division's brief to the ALJ). It is true that the Attorney General's crucial conclusions that the Free Press "has no realistic prospect of outlasting the *News* given the latter's substantial advertising and persistent circulation lead" and that the News "undoubtedly has the ability ... to outlast the Free Press" was predicated on the ALJ's findings recounting the News' lead in all major indices. It is also true that the ALJ went on to offer a somewhat different conclusion: that the Free Press was still within "striking distance" of the News and the latter's lead was "vulnerable." The Attorney General would not, however, be legally obliged to conform his judgment to that of a statutorily-required ALJ,[9] much less this one, who was employed as a matter of discretion rather than law. *See* 28 C.F.R. § 48.8 (1988). Both men relied on the very same facts to make different evaluations of the competitive strength of the Free Press. But, it is only the Attorney General's conclusions that have legal significance, and we cannot say that his determination is unreasonable. It is undisputed, after all, that the News has maintained the lead for a long time and that the Free Press had suffered extensive losses. Debatable, the Attorney General's appraisal may well be, but hardly unreasonable.

Similarly, appellants rely on the ALJ's contrary prediction to dispute the Attorney General's conclusion that the News would *not* release the pressure on the Free Press by raising prices if the JOA were disapproved. Gannett officials testified that they had no intention of raising prices regardless of the Attorney General's decision. The ALJ refused to credit this testimony, not on account of the witnesses' demeanor, but because he, the ALJ, thought that course would only cause more losses for the News and was therefore irrational.[10] *Cf. Universal Camera Corp.*

9. The APA explains that "[o]n appeal from or review of the initial decision, the agency has all the powers which it would have in making the initial decision except as it may limit the issues on notice or by rule." 5 U.S.C. § 557(b). "[I]n the last analysis it is the agency's function, not the [ALJ's], to make findings of fact and select the ultimate decision." *Greater Boston Tele-*

*vision Corp. v. FCC,* 444 F.2d 841, 853 (D.C.Cir. 1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971).

10. The ALJ said:
Newharth and other Gannett officials testified that without a JOA they will not raise circulation prices since they intend to maintain pres-

*v. NLRB*, 340 U.S. 474, 494–95, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951) ("The significance of [the ALJ's] report ... depends largely on the importance of credibility in the particular case."). The Attorney General's judgment of the News' likely future behavior was premised on his determination, which we have already found reasonable, that the News had the competitive strength to outlast the Free Press.[11] The ALJ never squarely found otherwise,[12] and if the News had such strength, we do not see how the Attorney General's projection can be deemed unreasonable. Under those circumstances, Gannett's refusal to raise prices, as the Attorney General said, "hardly reflects unsound business judgment."

Knight–Ridder seems to have thought that its competitor's strategy was rational, since its CEO testified that if the JOA were disapproved, the Free Press would close down. The ALJ again assigned "little weight" to that testimony, because "if a Free Press closure was imminent, it would have made no economic sense for [the News] to agree to share prospective JOA profits with [the Free Press]." Also, he

stressed that an anti-trust division expert had testified that the terms of the profit split (reaching 50/50 after five years) suggested that Gannett thought the Free Press would remain in existence for seven to ten years. The difficulty with the ALJ's analysis is that he equated the parties' bargaining positions prior to submission of a proposed JOA with their strategies after a rejection by the Attorney General. Prior to agreement, the Free Press had every incentive to convince the News that it would compete fiercely, and indefinitely into the future: Damn the losses; full speed ahead. Only by emphasizing its potential longevity could the Free Press extract favorable terms in a JOA. Thus, the Attorney General described the situation as the parties entered into the JOA, as a "competitive stalemate" with market domination "no longer within the grasp of either paper." But, that the News was willing to negotiate peace terms (the JOA) does not belie the Attorney General's appraisal of its fundamental superior strength. After this proceeding, in which all cards are placed on the table, it is wholly unrealistic

---

sure on the Free Press as they seek market domination. This strategy received the endorsement of Applicants' retained expert. But Gannett officials and retained expert never explained how Gannett can persist in this strategy in the face of uncontroverted proof that neither the News nor the Free Press can become profitable so long as both papers continue current competitive strategies. As it happens, contemporaneous evidence indicates that absent a JOA Gannett may eventually initiate circulation price increases as the way to return the News to profitability. (citations omitted).

**11.** The Attorney General wrote:

The argument is made that both papers should raise prices and discontinue advertising discounts. But the *Free Press* is currently selling its daily copy at 5 cents above the *News* and it offers a smaller discount rate. There is thus no competitive advantage to be gained by Knight–Ridder from a unilateral increase in prices; that market move must be accompanied by parallel price increases (and discount reductions) at the *News* if the papers have any chance of becoming profitable.

Gannett has made clear that it has no intention of embarking on such a course, either unilaterally or in conjunction with Knight–Ridder. While the Administrative Law Judge questioned the testimony of Gannett officials

to this effect, it hardly reflects unsound business judgment to retain awhile longer the *News'* current depressed pricing practices with so many indications that the *Free Press* and Knight–Ridder have abandoned all hope of market domination. (citations omitted).

**12.** The ALJ did predict at one point that the Free Press would "not enter the downward spiral so long as Knight–Ridder remains in Detroit." This view, however, seems to rely on the notion of a "deep pocket" supporting the paper, which is an impermissible consideration under the NPA, 43 U.S.C. § 1802(5), *but see* dissent at 2, and furthermore irrelevant in light of basic principles of economics. *See* Easterbrook, *Predatory Strategies and Counterstrategies*, 48 U.CHI. L.REV. 263, 270 (1981) ("[N]o theory of predation has explained *why* victims should lack access to capital.... There is no reason why the capital market should refuse to supply funds to the victim.").

He also projected that "[i]f the struggle continues, there is no convincing evidence that superior scale economies is [sic] likely to be determinative for the News." The import of this theory is unclear to us, because the downward spiral that leads to the demise of competitors in the newspaper industry is a phenomenon quite different from the traditional concept of advantageous economies of scale and apparently unique to this industry. *See supra* at 1288.

to assume that the parties will return to the game and play it as if this proceeding had never occurred. If a JOA were denied, the News would have every incentive to force the Free Press to the wall; even if it took seven years to win, at the end of that period the News would have a monopoly. And, if the Free Press were doomed to defeat in the long run, it was not only reasonable but optimal for the paper to close immediately.

The Attorney General had to consider which of the two papers would blink first in the event the JOA were *denied.* Gannett said that it would not, and Knight–Ridder said that it would. Appellants assert that it was unreasonable for the Attorney General to believe them, because the more likely event was the exact reverse: that if the JOA were denied, Gannett would raise prices and the Free Press would remain in business. The Attorney General, it would seem, did not want to play the high stakes regulatory game that his ALJ proposed. He obviously was concerned that if he gambled on the ALJ's prediction that both newspapers were bluffing, Detroit would lose a newspaper. That is not to say that the Attorney General should put undue stress on self-serving declarations by newspaper executives seeking a JOA. But here, the statements that the Attorney General credited follow a long period of bitter competition. For the News to stay the course, as for the British and French in 1917, promised absolute victory.

It may well be; as appellants argue and the ALJ found, that under ideal circumstances, Detroit could support two newspapers. The same could also be true of many cities that have lost competing newspapers and are now one newspaper monopoly towns. It is not at all clear whether the newspaper business in some cities is a natural monopoly, and, if so, in cities of what size. This sort of speculation, it seems to us, as it did to the Attorney General, is hardly conclusive. That an omniscient Detroit newspaper czar could set circulation and advertising prices that would permit both papers to return to profitable status is not a useful observation in this context. The Attorney General is required to determine what will actually happen in Detroit if his approval is withheld. It would, moreover, be anomalous for those responsible for enforcing the antitrust laws to try to guide and calibrate the competitive zeal of the two newspapers so as to reach that level of competition at which both newspapers could be profitable.

 Appellants might also be understood to complain that the Attorney General did not provide a reasoned explanation for his decision, because his only citations to the record at certain crucial points were to portions of the ALJ's opinion that reached different conclusions based on the same facts. Of course, the decision of the ALJ is part of the record and must be considered by the court when it determines whether the Attorney General's ruling is supported by substantial evidence or, in this case, arbitrary or capricious. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 493, 71 S.Ct. 456, 467, 95 L.Ed. 456 (1951). We have said that an agency must both express an awareness that it is disagreeing with an ALJ and set forth the basis of the disagreement. *Local 441, IBEW v. NLRB*, 510 F.2d 1274, 1276 (D.C.Cir.1975); *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 853 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). To reverse the Attorney General, however, for failure to state at the exact point of the citations the obvious nature of his disagreement with the ALJ would be excessive judicial nitpicking. His difference with the ALJ is clear throughout the opinion, and although "[t]he explanation may have been curt, ... it surely indicated the determinative reason for the final action taken." *Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

\* \* \* \* \* \*

The real difficulty with this case—the factor that quite plainly underlies the ALJ's discomfort as well as appellants' quarrel with the Attorney General's decision—is the effect that the prospect of a JOA has on the behavior of competing newspapers. *See also* dissent at 1299. It

is feared that the statute authorizing a JOA creates a self-fulfilling prophecy. Newspapers in two newspaper towns will compete recklessly because of a recognition that the loser will be assured a soft landing.

Appellants argue that the Attorney General inadequately considered whether or not "critical aspects of the newspapers' conduct were influenced by the prospect of obtaining a JOA." But his opinion addressed this "dual motive" concern at some length; he observed that this was not the classic case that had worried Congress, where a newspaper had "brought itself to the brink of financial failure through improper marketing practices or culpable management." Instead, the record of years of fierce competitive and consequent losses to both papers led the Attorney General reasonably to conclude that both papers were principally pursuing market domination and that their strategies had been followed before any mutual discussion of a JOA. Nevertheless, the Attorney General implicitly recognized that it would be impossible completely to preclude competing newspapers from factoring into their business strategy the prospect of a JOA. As he laconically put it, "newspapers cannot be faulted for considering and acting upon an alternative that Congress has created." [13]

We can envision a perfectly rational different policy, one that would require a showing that the weaker paper was more bloodied before approving a JOA and therefore *might* discourage the sort of competition we saw in Detroit. Congress, however, delegated to the Attorney General, not to us, the delicate and troubling responsibility of putting content into the ambiguous phrase "probable danger of financial failure." We cannot therefore say that his interpretation of that phrase as applied to this case, with all of its obvious policy

implications, was unreasonable. The judgment of the district court therefore is

AFFIRMED.

RUTH BADER GINSBURG, Circuit Judge, dissenting:

As a condition to the consummation of a joint operating agreement (JOA), and receipt of the attendant antitrust exemption, Congress required the approval of the Attorney General, an approval intended to "act as a brake" upon premature resort to such devices. 116 CONG.REC. 2006 (1970) (statement of Sen. Hruska). In this important and unprecedented case, the Attorney General approved a JOA and, in so doing, rejected the contrary conclusions of the administrative law judge (ALJ) and the Justice Department's Antitrust Division, as elaborated in the post-hearing brief the Division presented to the ALJ. At issue is a large and attractive newspaper market, Detroit, one concededly capable of sustaining two profitable newspapers. I have grave doubts whether the Attorney General properly performed in this instance the braking function Congress envisioned for him. I would therefore remand the case for reconsideration and a fuller account of the standard of approval the Attorney General deems applicable.

I.

As the Antitrust Division emphasized before the ALJ, no prior JOA application "has presented a comparable situation." Post–Hearing Brief of the Antitrust Division, Docket No. 44–03–24–8 (Sept. 23, 1987) [hereafter, Antitrust Division Brief], at 2. The Detroit Free Press (a morning newspaper)-Detroit News (evening paper) application "involves the largest market and largest newspapers" in the nation "ever to be involved in a JOA." *Id.*[1] Applicants con-

---

**13.** We need not consider the hypothetical situation where the initial and principal motivating factor behind a price war is the prospect of a future JOA. The Attorney General was reasonable to conclude that this record did not present such a situation.

**1.** The Assistant Attorney General in charge of the Antitrust Division, in recommending that a hearing be held before an ALJ, stated: "Clearly, Detroit remains one of the largest and most attractive newspaper markets in the country." Report of the Assistant Attorney General, Public File No. 44–03–24–8 (July 21, 1986) [hereafter,

cede that the Free Press is unlike any other newspaper thus far declared "failing." The typical case presents an applicant caught in a "downward spiral" in which the newspaper's "declining circulation and lessening advertising feed off one another, eventually forcing it to close." *Committee for an Independent P–I v. Hearst,* 704 F.2d 467, 471 (9th Cir.), *cert. denied,* 464 U.S. 892, 104 S.Ct. 236, 78 L.Ed.2d 228 (1983). The only Newspaper Preservation Act–JOA before this one to be examined in court, *Hearst,* fit that description.

Just as there is no dispute that the Free Press and the News have both incurred significant losses on an operating basis,[2] so it is undisputed that neither paper has experienced any "downward spiral" effect. On the contrary, in the relevant time period, 1976 to 1986, the Free Press share of daily circulation was never less than 49%; its competitive position has remained essentially stable; the News, though retaining a "leading" edge, is not "dominant." Antitrust Division Brief at 7–11. In other words, the two papers, each now maintained by a "deep pocket," the News by Gannett, the Free Press by Knight–Ridder, have fought to a draw. Neither has achieved supremacy. The competition today "is as close, or closer, than it was a decade ago." *Id.* at 2.[3]

Gannett, it is also conceded, acquired the News only after obtaining expression of Knight–Ridder's willingness to consider a JOA. *Id.* at 27–28. The nearly equal profit split for the Free Press under the JOA indicates the "standoff" that existed; it reflects "a recognition on Gannett's part that the Free Press was not likely to exit

the market in the near future." *Id.* at 20–22. No "failing" paper in Newspaper Preservation Act history, it appears, has emerged so advantageously under an approved JOA. *Id.* at 22. In these circumstances, I believe it incumbent on the Attorney General to recall—as our sister court observed—the legislature's "primary" concern "to prevent newspapers from allowing or encouraging financial difficulties in the hope of reaping long-term financial gains through a JOA." *Hearst,* 704 F.2d at 478.[4]

## II.

Three "failing newspaper" standards figured in the design of the Newspaper Preservation Act: the deathbed "failing company" doctrine which Congress rejected; the "not likely to remain or become financially sound" standard Congress adopted for existing JOAs, *i.e.,* those entered into prior to July 24, 1970; and the "probable danger of financial failure" definition Congress set for future JOAs. *See* 18 U.S.C. §§ 1802(5), 1803(a), (b) (1982); *Hearst,* 704 F.2d at 473–74. Under the "failing company" doctrine, as stated by the Supreme Court in *Citizen Publishing Co. v. United States,* 394 U.S. 131, 137–38, 89 S.Ct. 927, 930, 22 L.Ed.2d 148 (1969), newspapers with JOAs could successfully defend against illegal merger or agreement charges only upon showing an enterprise in dire financial straits, on the brink of collapse, reaching for "the last straw." Congress thought that doctrine too exacting. It settled on a more lenient definition to grandparent existing JOAs and, as the Attorney General acknowl-

---

Assistant Attorney General Report], at 3 (executive summary); *see id.* at 27 (same observation).

**2.** As the Majority Opinion at 1289 reports, the Free Press lost over $10 million per year from 1981 to 1986, while the News lost over $50 million between 1981 and 1986.

**3.** This portrait of the competitive situation, drawn in the Antitrust Division Brief, contrasts with the majority's depiction of the Free Press as "poised on the brink of the [downward] spiral." Maj.Op. at 1292. The majority recognizes that the downward spiral is indicated "[o]nce a paper loses circulation." *Id.* at 1288. In this

light, the Antitrust Division emphasized the precarious position of the News: "The News has been unable to convert its leads into any degree of profitability; instead, its losses in 1986 increased as it sought to protect a daily circulation lead which it appeared to be on the verge of losing." Antitrust Division Brief at 10.

**4.** *Cf.* Assistant Attorney General Report at 6–7 (executive summary) ("When a newspaper owner consciously and deliberately decides to sacrifice short-term profits in a quest for greater long-term profits, indeed potential monopoly profits, should a JOA be available as a 'second-best' alternative?"); *id.* at 66 (same query).

edged in this case, it conceived the "probable danger of financial failure" standard for future JOAs as a "middle ground," one falling in between the other two. *See* Attorney General's Decision and Order, Docket No. 44–03–24–8 (Aug. 8, 1988) [hereafter, Attorney General's Decision], at 8.

The Newspaper Preservation Act's legislative history confirms that the "probable danger" standard was meant to have bite, to be "far more stringent" than the "not financially sound" test, 116 CONG.REC. 23,146 (statement of Rep. Kastenmeier), and thus "limited only to those situations where a joint newspaper operating arrangement is demonstrably essential to prevent a newspaper failure." *Id.* at 23,-148 (statement of Rep. McCulloch). Given the congressional design, approval of a proposed JOA requires an affirmative answer to this question: "Is the [allegedly failing] newspaper suffering losses which more than likely cannot be reversed?" *Hearst,* 704 F.2d at 478.

The Attorney General's readiness to say "Yes" to a JOA for Free Press–Detroit News now, despite the view of the Antitrust Division and the ALJ that such a judgment remains premature,[5] seems to me problematic on two counts. First, the Decision affords no assurance that the Attorney General has found a "middle ground" firmer than the pliant "not likely to ... become financially sound" ground Congress thought inadequate for new agreements. The Decision never suggests any separate content for the "probable danger" standard to distinguish it from the more accommodating one. Second, the demonstration that satisfied the Attorney General allows parties situated as Gannett and Knight–Ridder are artificially to generate and maintain the conditions that will yield

them a passing JOA. I remain unpersuaded that, with passage of the Newspaper Preservation Act, Congress opened the door to this sort of self-serving, competition-quieting arrangement. *Cf.* Attorney General's Decision at 12 (maintaining that "Congress opened the door to just this sort of response with passage of the Newspaper Preservation Act").

It is accepted by the Attorney General that the Free Press and News have arrived at a "competitive stalemate," Attorney General's Decision at 5, and that market dominance is "no longer within the grasp of either paper." *Id.* at 13. It is also a "given" that "the Detroit market *could* sustain two profitable newspapers *if* both circulation and advertising prices were increased." *Id.* at 9 n. 3 (emphasis in original). But "the unbroken pattern of annual operating losses" cannot be reversed by Free Press "unilateral actions," and that, in the Attorney General's judgment, makes "probable" if not "imminent" the "danger of financial failure." *Id.* at 7, 12.

Without the lure of a JOA, however, what reason is there to believe that the losses here "likely *cannot* be reversed"? Absent the Attorney General's promise of that large pot of gold, would the parties not have, as the Antitrust Division suggested, an effective "incentive to adopt strategies directed toward achieving profitability in a competitive marketplace"? Antitrust Division Brief at 27, 28.

The Attorney General does not disavow "the well-recognized rule that antitrust exemptions must be narrowly construed." *Hearst,* 704 F.2d at 478 (citing *Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 231, 99 S.Ct. 1067, 1083, 59 L.Ed. 2d 261 (1979)). This accepted rule[6] should be factored into an evaluation already

---

**5.** It bears repetition that the ALJ's decision reflected the position presented to him as the decided view of the Antitrust Division, the very Department of Justice unit responsible for enforcing the antitrust laws. The bottom lines of the brief filed by the Division after the ALJ hearing state: "[T]he record does not warrant the conclusion that Detroit cannot support two competitive papers or that the Free Press is in probable danger of failure if the JOA is denied. The Antitrust Division therefore recommends

that the application be disapproved." Antitrust Division Brief at 29.

**6.** My colleagues deem the rule one the Attorney General need not "pick" if he finds the statute ambiguous. *See* Maj.Op. at 1292–93. At the same time, however, my colleagues recognize that the *Hearst* court's analysis was "guided by" the rule. *Id.* at 1292. *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), modifies *Hearst* pro tanto, the majority next maintains, and rele-

weighted by (1) the concession that both newspapers, by their own projections, "could achieve profitability with price increases and the elimination of discounting," Attorney General's Decision at 5, and (2) the burden of proof which JOA applicants bear, 28 C.F.R. § 48.10(a)(4) (1988). A remand would give the Attorney General an opportunity to state more comprehensibly why the JOA-route is ripe for his approbation now, *i.e.*, why that course should not be deferred for consideration "at some future time" when the results of the current competition afford a firmer basis for predicting whether the Free Press, profitably for itself, for readers, and for advertisers, can survive. *See* Antitrust Division Brief at 29.

CONCLUSION

Detroit, as the Attorney General said, "is a highly prized $300 million dollar market." Attorney General's Decision at 4. That market could sustain two profitable newspapers. *Id.* at 9 n. 3. Market dominance is now beyond the grasp of the News as well as the Free Press. *Id.* at 13. The Attorney General has not cogently explained why, on the facts thus far found, the proposed JOA has become "an available option." *Id.* Making the JOA an option now, in the situation artificially created and maintained by the Free Press and the News, moves boldly away from the "frame of reference [Congress] essentially embraced"—"the scenario of a strong newspaper poised to drive from the market a weaker competitor," a newspaper experiencing, "due to external market forces," a decline in revenues and circulation "that in all probability cannot be reversed." *Id.* at 6, 13–14. I therefore dissent from the majority's disposition approving instanter the giant stride the Attorney General has taken.

gates the "narrow construction of antitrust exemptions" rule to cases in which Congress had a specific intent. *See* Maj.Op. at 1292. Did *Chevron* indeed uproot a guide (both to the executive and to the judiciary) of such "fundamental importance" (*Hearst*, 704 F.2d at 473) to antitrust

law administration? Under *Chevron*, is it the Attorney General's prerogative to construe an ambiguously-phrased antitrust law exemption expansively? The answer to these questions, I believe, unless and until Higher Authority tells us unambiguously otherwise, must be "No."